John YIAMOUYIANNIS, Appellant,

v.

CONSUMERS UNION OF the UNITED STATES, INC., Appellee.

No. 470, Docket 79–7541.

United States Court of Appeals,
Second Circuit.

Argued Dec. 12, 1979.

Decided March 19, 1980.

OAKES, Circuit Judge:

This appeal in a diversity libel action is from a summary judgment for the defendant granted by the United States District Court for the Southern District of New York, Richard Owen, Judge. The plaintiff, John Yiamouyiannis, Ph.D., brought suit against Consumers Union of the United States, Inc. (Consumers Union) for libel said to have been contained in a two-part series of articles appearing in appellee's magazine, *Consumer Reports*, in July and August of 1978. The articles, entitled *Fluoridation: The Cancer Scare* and *The Attack on Fluoridation—Six Ways to Mislead the Public*, as their titles imply, attacked as misleading and erroneous the claims made by certain individuals and organizations that fluoridation causes cancer, birth defects and other ills. Appellant claims that he was defamed, particularly in the scientific community, but also in the eyes "of his fellow countrymen to whom he has something important to say" and "whom he serves and must convince." We affirm the judgment.

Briefly stated, the underlying facts are these: Dr. Yiamouyiannis is and for many years has been an active opponent of the fluoridation of public water supplies, and since 1974 has been a paid employee of the National Health Federation, which is an organization that for over twenty years has been actively opposed to fluoridation. Dr. Yiamouyiannis has also authored over fifteen articles on fluoride and is a coeditor of a quarterly, *Fluoride*, published by the International Society for Fluoride Research. He appeared actively before the Subcommittee on Intergovernmental Relations and Human Resources of the House Committee on Governmental Operations on September 21 and October 12, 1977,[1] both to state his own views on the dangers of fluoridation and to refute the arguments of the National Cancer Institute (NCI) and various other

John R. Graham, Minneapolis, Minn. (Paul S. Beeber, Plainview, N. Y., Kirkpatrick W. Dilling, Chicago, Ill., James K. Simakis, Columbus, Ohio, of counsel), for appellant.

Michael N. Pollet, New York City (Karpatkin, Pollet & LeMoult, Steven Delibert, New York City, of counsel), for appellee.

Before MULLIGAN, OAKES and GURFEIN,* Circuit Judges.

* Judge Gurfein heard the argument on December 12, 1979, but died unexpectedly shortly thereafter. He expressed agreement with the result in this case, however.

1. *See The National Cancer Program (Part 2.— Fluoridation of Public Drinking Water): Hearings Before the Subcomm. on Intergovernmental Relations and Human Resources of the House Comm. on Governmental Operations*, 95th Cong., 1st Sess. (1977) (hereinafter "Hearings Record").

organizations that have taken the position that fluoridation is not harmful and helps significantly in the prevention of dental caries. These other organizations include the National Academy of Sciences, the National Heart, Lung and Blood Institute, the American Medical Association, the American Cancer Society, and the American Dental Association.

The *Consumer Reports* article was written by Joseph R. Botta, a senior editor on the magazine staff. Botta is a professional journalist who has been a scientific writer for fifteen years, having worked for the Shell Oil Company from 1959 to 1971, and for Consumers Union in the environmental and health areas since 1972. Botta became interested in the topic of the campaign against fluoridation after having read an article in the *New England Journal of Medicine*—Walsh, *Fluoride: Slow Diffusion of a Proved Preventive Measure*, 296 New England J.Med. 1118 (1977)—and an article in a leading British medical journal—Doll & Kinlen, *Fluoridation of Water and Cancer Mortality in the USA*, Lancet, June 18, 1977, at 1300. But it was only when the

House Subcommittee held hearings on the effects of fluoridation and its possible link to cancer that the decision to write and publish an article on the subject was made. Botta obtained a copy of the transcript of the hearings before the House Subcommittee and reviewed some standard medical reference works, which led him to the World Health Organization's 1970 report, *Fluorides and Human Health*, and to other studies on fluoridation. His conclusion from these studies, as stated in his affidavit, was that there was "*no* acceptable scientific evidence of any kind that the practice of fluoridating drinking water at appropriate levels had any deleterious effects whatever" (emphasis in original).

In the course of Botta's research he also made reference to studies by the British Royal College of Physicians, by the Royal Statistical Society and by investigators at Oxford University. The Subcommittee hearings record contained a schedule, set out in the margin, of studies between 1954 and 1977 showing no association between cancer incidence or deaths and fluoride.[2]

2.

| Year and institution | Method | Association with flouride |
|---|---|---|
| 1954: Division of Dental Public Health (USPHS) ....... | Cancer deaths in U.S. cities (N) ................. | None |
| 1962: Ministry of Health, Great Britain ............... | Cancer deaths in English cities (N) ............ | Do. |
| 1974: Medical Research Council (G.B.), London School of Hygiene .............. | Cancer deaths in English cities (N) (reanalysis of 1962 study) ........... | Do. |
| 1975: Oxford University (England) | Cancer incidence in English cities and rural areas (N) | Do. |
| Do..................... | Cancer incidence in cities and rural areas of New York, Connecticut, Holland, and New Zealand (A) ................... | |
| 1976: National Cancer Institute (U.S.) ................ | Cancer deaths in U.S. counties (N) ............. | Do. |
| Do..................... | Cancer deaths in U.S. counties (A) ............. | Do. |
| Do..................... | Cancer incidence in U.S. cities (A) ............ | Do. |
| 1977: National Heart, Lung, and Blood Institute (U.S.) ... | Cancer deaths in U.S. cities (A) ................. | Do. |
| 1977: Center for Disease Control (USPHS) ............. | do. .................... | Do. |

Accordingly, Botta was led by "the overwhelming weight of scientific evidence" to have serious doubts as to the credibility to be accorded to Dr. Yiamouyiannis's work—two unpublished versions of which, dating from July and December of 1975, were criticized by the National Cancer Institute. Hearings Record at 98–101, 110–113, 203–208. A more recent version of appellant's work, presented in England in May of 1977 and published in the magazine *Fluoride*, was incorporated in the hearings record. *Id.* at 18–40.

A brief review of the *Consumer Reports* articles is as follows: The first article, published in July 1978, relates how Dr. Yiamouyiannis's colleague, Dean Burk, Ph.D., an American biochemist, helped to kill a proposal before the Dutch Parliament to fluoridate water supplies, by virtue of a television interview in Holland in 1976 in which he told the audience that "fluoridation is a form of public mass murder." The article discusses the defeat in Los Angeles and hundreds of other American communities of fluoridation proposals, and mentions the House Subcommittee hearings. What emerged from the testimony, the article says, was "an unmistakable sense that millions of Americans are being grossly misled about fluoridation. The article then describes the initial investigation in the 1930s and 1940s resulting in the conclusion that fluoridation helps prevent dental cavities, and also refers to the opposition that gradually developed. This opposition is now led by the National Health Federation, whose roots, the article says, "run deep into the soil of medical quackery." [3] The article goes on to say that in 1974, the NHF decided to " 'break the back' " of fluoridation efforts and "hired Dr. Yiamouyiannis to do the job." It says that he was successful in influencing the debate in 1974 in Los Angeles, and that his July 1975 study with Dr. Burk (who is said to be a leading advocate of laetrile along with the NHF), "failed [according to the NCI] to take into account widely recognized risk factors known to affect the death rate." It adds that a later December 1975 study was even more "amateurish," according to an NCI official, and ignored "the most fundamental factors involved in cancer mortality rates—age, sex and race." The article reports that Drs. Burk and Yiamouyiannis were successful in Holland, but unsuccessful in England, and points out that "independent investigations by seven of the leading medical and scientific organizations in the English-speaking world have unanimously refuted the National Health Federation's cancer claims." *See* note 2 *supra.*

The second article, published one month later, refers to other claims that fluoridation causes harm, yet nowhere mentions Dr. Yiamouyiannis, Dr. Burk, or the National Health Federation in refuting theories that fluoride is a poison, causes birth defects, is mutagenic, causes allergic reactions, causes cancer in animals, and contributes to heart disease. However, the article does state that "every type of misrepresentation known to Disraeli" has "been used to attack fluoridation," referring to the "misleading

| Year and institution | Method | Association with flouride |
|---|---|---|
| 1976: Royal College of Physicians (England) ............. | Review (N & A) ......... | Do. |
| 1977: National Academy of Sciences (U.S.). ........ | do. ..................... | Do. |

Hearings Record at 101 ("Do." means "ditto").

---

3. According to the article in 1963 the FDA released a report on the NHF that said in part:
   The stated purpose of the federation is to promote "freedom of choice" in health matters. This record shows that what this frequently means is freedom to promote medical nostrums and devices which violate the law. From its inception, the federation has been a front for promoters of unproved remedies, eccentric theories and quackery.

information" that appears regularly in a paper called the *National Fluoridation News,* and also states that the "entire gamut of hokum" has recently been published in an issue of the *Cancer Control Journal,* a pro-laetrile magazine based in Los Angeles. The article concludes by saying that the "simple truth is that there is no 'scientific controversy' over the safety of fluoridation," and that the "survival of this fake controversy represents, in CU's opinion, one of the major triumphs of quackery over science in our generation."

Appellant's unverified complaint in four counts, each seeking two million dollars in damages, complains of defamation mainly by innuendo. In essence, appellant reads the articles as saying that his work is "grossly and irresponsibly misleading" the American people; that fluoridation is absolutely and unquestionably safe; that appellant sold his scientific integrity and objectivity to contrive a deliberately false case against fluoridation; that appellant's work is incompetent "claptrap" and overlooks fundamental risk factors that elementary principles require; that appellant and Dr. Burk have insisted both in America and Europe that fluoridation is mass murder; and that they are men of no credibility or honor. All of this is said to be false and to have been published with the purpose of destroying the appellant's reputation with "willful or reckless disregard of the facts."

In moving for a summary judgment, appellee submitted Mr. Botta's affidavit as well as the House Subcommittee hearings. The affidavit set forth Botta's account of research, as above stated, which was undisputed, as well as his investigation of the background and qualifications of Drs. Yiamouyiannis and Burk and his consultations before publication, also undisputed. These consultations were with (1) the Consumers Union library staff, to determine the reliability of supporting references, (2) the technical department, (3) an in-house medical consultant, (4) an outside medical advisor, (5) a dental consultant, (6) a Ph.D. with experience in epidemiology and the safety of water supplies, (7) a psychiatrist who in connection with health fraud had investigated and written about the National Health Federation, (8) the head of the Environmental Studies Section of the Environmental Epidemiology Branch of NCI, and (9) a professor of biochemistry of the University of Minnesota, all of whom, after some suggested changes that were incorporated into the final version of the article, agreed that it was reliable and accurate.

Dr. Yiamouyiannis's counteraffidavit takes particular issue with the statement in the first article that he and Dr. Burk had ignored the most fundamental risk factors —age, sex and race—and says that this related only to their 1975 preliminary studies, whereas their later works did take these into account.[4] The counter-affidavit

4. The Hearings Record at 203–04 contains the following testimony, as to the later 1977 paper, from Dr. Robert N. Hoover, Head, Environmental Studies Section, Environmental Epidemiology Branch, Division of Cancer Cause and Prevention of the National Cancer Institute:

Mr. Fountain. Dr. Newell, Mr. Goldhammer informs me that he asked NCI to review and to analyze a paper "Fluoridation and Cancer" written by Dr. Yiamouyiannis and Dr. Burk and published in the publication *Fluoride.* Has NCI done this?
Dr. Newell. I will defer to Dr. Hoover.
Dr. Hoover. Yes, I have, sir.
Mr. Fountain. Would you give your expert assessment of the paper from your point of view?
Dr. Hoover. The paper attempted to address some of the criticisms that have been directed at their earlier studies in that they

had not controlled for age, sex and race, differences between the two areas.
In the paper, they did not control for race and said they did not think they had to. They attempted to control for age by using very broad age categories.
So, in essence, they did not address the criticisms and they did not control for race, and they did not adequately control for age.
Therefore, I think the same criticisms that applied to the earlier works, such as inadequate control for differences between the two groups of cities, apply to their more recent effort.
In fact, even the crudeness of the analysis that they have done contributes to our opinion that there is, in fact, no association.

In general, there is a dictum in epidemiology. The crudest control is no control at all. That is using one age category. If you do a

also says that data and procedures of NCI were shown in Congress to be flawed by critical errors and omissions and that it was this data that was copied in England, thereby showing "the political intrigue of the current cover-up of the fluoridation cancer link." [5] He goes on to say that the seven independent investigations alluded to in the Botta article did not address the most recent and comprehensive study by Dr. Burk and the affiant appearing in *Fluoride* magazine, so that his work had not been "refuted." [6] Other issues with regard to the scientific viability of the fluoridation controversy are detailed.

Judge Owen below granted the motion for summary judgment, concluding that appellant had failed to meet his burden, under *New York Times Co. v. Sullivan*, 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964), of establishing, "by clear and convincing evidence, at least a genuine issue of fact as to whether the articles were published with 'actual malice,'" *i. e.*, knowledge of falsity or reckless disregard of the truth. To make this showing, appellant relied mainly on the theory that the article was directly contradicted by one of the principal sources relied on by the publisher, the House Subcommittee report itself. But the judge held that no serious showing was made that either the author or the editor of the article "had the slightest doubt as to [the article's] truth and accuracy." Because of what it considered an absence of evidence of subjective awareness of probable falsity, *see Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 334 n.6, 94 S.Ct. 2997, 3004, 41 L.Ed.2d 789 (1974) (citing *St. Amant v. Thompson*, 390 U.S. 727, 731, 88 S.Ct. 1323, 1325, 20 L.Ed.2d 262 (1968)), the court was compelled to award summary judgment.

DISCUSSION

The rule of *New York Times Co. v. Sullivan, supra*, 376 U.S. at 279–80, 84 S.Ct. at 725–726, is that, constitutionally, a public official cannot recover for a defamatory statement relating to his official conduct absent proof that the statement was made with "actual malice" as defined therein and subsequently in *St. Amant v. Thompson*, 390 U.S. 727, 731, 88 S.Ct. 1323, 1325, 20 L.Ed.2d 262 (1968). This rule was expanded to cover "public figures," at least on matters of public interest, in *Curtis Publishing Co. v. Butts*, 388 U.S. 130, 87 S.Ct. 1975, 18 L.Ed.2d 1094 (1967). In *Gertz v. Robert Welch, Inc., supra*, 418 U.S. at 344–48, 94 S.Ct. at 3009–3011, however, the Court declined to accept what the late Harry Kalven referred to as the "invitation to follow a

---

very crude control by splitting into several groups and you knock an association way down, it indicates to epidemiologists that maybe you need to achieve very fine control. That is, you need to take the controlling categories down to a finer level in order to see what happens to the association.

**5.** The Hearings Record at 208 contains the following:

Dr. Hoover. Dr. Yiamouyiannis has demeaned some fairly renowned scientists in Great Britain by saying that they put their names on our publications. That is clearly not true. If you read their materials, you will see that it is not true. They used different standards than we did and they used truly elegant analyses which went much beyond what we did in our instant reanalysis. They did use the same set of data, however, and, therefore, they had the 1.5 percent error we did. We transmitted that information to them and then called them to see if correction of this error changed their conclusions.

I talked with Dr. Kinlen of Oxford on the phone, and I wish I could do the British accents for you, but Dr. Kinlen said, "Of course, it makes no difference at all."

Dr. D. J. Newell of the Royal Statistical Society said he had written me a letter but he did not call me because there was nothing urgent about it and the correction really made no difference in their conclusions either.

So, I think you can rest assured that the conclusions reached by Oxford and by the Royal Statistical Society are as they were published.

The error was not one of addition but of geography in that the NCI erroneously included all the deaths from Suffolk County (14,487) rather than the City of Boston (14,272). *Id.* at 81, 208. This made a difference of 1½–2%. *Id.*

**6.** *But see* notes 4 and 5 *supra.*

dialectic progression," [7] and refused to extend *Sullivan* to private individuals. In holding that an attorney representing the family of the victim in a police shooting was not a public figure, the Court, after noting that public officials and public figures have greater access to the channels of effective communication than private individuals, added that most public figures have "voluntarily exposed themselves to increased risk of injury from defamatory falsehood concerning them." *Id.* at 345, 94 S.Ct. at 3010. The Court described two ways in which people may be classified as "public figures":

> For the most part those who attain this status have assumed roles of especial prominence in the affairs of society. Some occupy positions of such persuasive power and influence that they are deemed public figures for all purposes. More commonly, those classed as public figures have thrust themselves to the forefront of particular public controversies in order to influence the resolution of the issues involved. In either event, they invite attention and comment.

*Id.* [8]

On this basis, Mrs. Firestone, the plaintiff in a contested Palm Beach divorce case that had allegations on both sides of adultery and was a *cause celebre* in Palm Beach if not in all of Florida, was held not to be a public figure. *Time, Inc. v. Firestone*, 424 U.S. 448, 453–55, 96 S.Ct. 958, 964–965, 47 L.Ed.2d 154 (1976). More recently, the Court held that a researcher of animal aggressive behavior, who had received federal funds for his research and received Senator Proxmire's "Golden Fleece Award," was not a public figure. *Hutchinson v. Proxmire*, 443 U.S. 111, 133–136, 99 S.Ct. 2675, 2687–2688, 61 L.Ed.2d 411 (1979). The same is true of an individual who, in the late 1950s, was held guilty of contempt and given a suspended sentence with attendant publicity, for failure to appear before a grand jury investigating Soviet espionage. *Wolston v. Reader's Digest Association*, 443 U.S. 157, 162, 99 S.Ct. 2701, 2705, 61 L.Ed.2d 450 (1979). This person had in the interim returned to private life. In each case the *Gertz* formulation quoted above was relied upon for the result reached. *Firestone, supra*, 424 U.S. at 454–55, 96 S.Ct. at 965; *Hutchinson, supra*, 443 U.S. at 134, 99 S.Ct. at 2687; *Wolston, supra*, 443 U.S. at 164, 99 S.Ct. at 2706.

■ Under that formulation, we have no doubt that appellant is a "public figure." While he is not one of those occupying a position of persuasive power and influence so as to be deemed a public figure for all purposes, he clearly is a person who has "thrust" himself "to the forefront" of a particular public controversy—that pertaining to fluoridation—"in order to influence the resolution of the issues involved," thereby in *Gertz's* words "invit[ing] attention and comment." 418 U.S. at 345, 94 S.Ct. at 3009.

Indeed, we do not understand appellant to dispute this; Judge Owen below stated that he was "an admitted public figure." And appellant's brief on appeal does not claim otherwise, though no express concession is made. But if there were any doubt about it, appellant's own complaint and affidavits would resolve it. His complaint notes that he is "Science Director of the National Health Federation, an organization *dedicated to the promotion* of health freedoms throughout the United States." Complaint ¶ 1 (emphasis supplied). It states that his work has been made "a matter of public record" in a "scientific paper," in the House Subcommittee Hearings, and in hearings before the Allegheny County Court of Common Pleas.[9] *Id.* ¶ 2.

---

7. Kalven, The New York Times *Case: A Note on "The Central Meaning of the First Amendment,"* 1964 Sup.Ct.Rev. 191, 221.

8. *See* Note, *The Editorial Function and The* Gertz *Public Figure Standard*, 87 Yale L.J. 1723, 1733 (1978) (describing two "branches" of *Gertz* rule).

9. Exhibit 13, attached to appellant's affidavit, is a brief submitted to the Court of Common Pleas of Allegheny County, Pennsylvania in *Aitkenhead v. Borough of West View*, 40 Pa. Cmwlth. 547, 397 A.2d 878, a case in which the

His affidavit states that he is a "recognized expert on the biological effects of fluoride," "has authored over fifteen articles on fluoride," and has "demonstrated to [Congressmen] that . . . the National Cancer Institute made . . . significant error(s)." Affidavit of Dr. Yiamouyiannis ¶¶ 1, 6. His statement pursuant to Local Rule 9(g) does not deny the following statements by appellee: that he "is and for many years has been an active and vociferous opponent of" fluoridation; that "since 1974, has been a paid employee of the National Health Federation, which has itself for over two decades been actively and vociferously opposed to fluoridation"; that he has produced studies obtaining broad distribution, including one in the City of Los Angeles, at a time when the voters of that city were to pass upon a water fluoridation referendum; that he has voluntarily sought and obtained the very widest publicity for himself and his views, in newspaper and magazine articles, radio and television broadcasts, public speeches, and other public forums; that he has testified at length as to his views, in various judicial proceedings, and in the Subcommittee hearings; and that he has maintained for the past five years that the reason for his discharge as an employee of the Chemical Abstracts Service was his notoriety as an opponent of fluoridation.

In the light of the foregoing, appellant is clearly a public figure and the "actual malice" test of *Sullivan* therefore clearly applies.

Appellant's principal claim on appeal is that the district court erred in granting summary judgment because it thought, erroneously, that in libel cases summary judgment " 'may well be the "rule" rather than the "exception." ' " District Court Opinion at 2 (quoting *Oliver v. Village Voice, Inc.,* 417 F.Supp. 235, 237 (S.D.N.Y.1976), which in turn quoted *Guitar v. Westinghouse Electric Corp.,* 396 F.Supp. 1042, 1053 (S.D.N.Y.1975), *aff'd mem.,* 538 F.2d 309 (2d Cir.

court on the strength of the Burk-Yiamouyiannis study of 1977 preliminarily enjoined fluoridation under a permit granted by the state

1976)). While this view of the district court had considerable support in the case law at the time it was expressed, *e. g., Treutler v. Meredith Corp.,* 455 F.2d 255, 257 n.1 (8th Cir. 1972); *Washington Post Co. v. Keogh,* 125 U.S.App.D.C. 32, 34–35, 365 F.2d 965, 967–68 (D.C.Cir.1966), *cert. denied,* 385 U.S. 1011, 87 S.Ct. 708, 17 L.Ed.2d 548 (1967), footnotes in the recent *Hutchinson* and *Wolston* cases in the Supreme Court raise serious doubt as to the continued legal viability of the proposition, expressed in *Keogh,* that "[t]he threat of being put to the defense of a lawsuit . . . may be as chilling to the exercise of First Amendment freedoms as fear of the outcome of the lawsuit itself." *Id.* at 968. Footnote 9 of the Chief Justice's opinion in *Hutchinson* not only states "doubt" about the supposed "rule" (supporting summary judgment), but takes almost the opposite position:

Considering the nuances of the issues raised here, we are constrained to express some doubt about the so-called "rule." The proof of "actual malice" calls a defendant's state of mind into question, *New York Times v. Sullivan,* 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964), and does not readily lend itself to summary disposition. See 10 Wright & Miller, Federal Practice and Procedure § 2730, at 590–592. Cf. *Herbert v. Lando,* 441 U.S. 153, 99 S.Ct. 1635, 60 L.Ed.2d 115 (1979). In the present posture of the case, however, the propriety of dealing with such complex issues by summary judgment is not before us.

443 U.S. at 120 n.9, 99 S.Ct. at 2680 n.9. *Wolston* refers to this footnote, but again does not reach the question. 443 U.S. at 161 n.3, 99 S.Ct. at 2704 n.3. And at least one appellate court has already said that "the same principles applicable to normal summary judgment motions are applicable to such motions when made in a public figure libel action." *Nader v. de Toledano,* 408 A.2d 31, 50 (D.C.1979), *cert. denied,* —— U.S. ——, 100 S.Ct. 1028, 62 L.Ed.2d 761 (1980).

Department of Environmental Resources ten years before.

940

■ Until more directly advised, we think that this neutral approach correctly states the rule as it is presently in force: neither grant nor denial of a motion for summary judgment is to be preferred. Defamation actions are, for procedural purposes, such as discovery, *see Herbert v. Lando,* 441 U.S. 153, 99 S.Ct. 1635, 60 L.Ed.2d 115 (1979), or for summary judgment, to be treated no differently from other actions; any "chilling effect" caused by the defense of a lawsuit itself, *see Herbert v. Lando,* 568 F.2d 974, 980 (2d Cir. 1977) (Kaufman, C. J., for the court), *rev'd,* 441 U.S. 153, 99 S.Ct. 1635, 60 L.Ed.2d 115 (1979); *id.* at 993–94 (Oakes, J., concurring); *Washington Post Co. v. Keogh, supra,* 365 F.2d at 968, is simply to be disregarded, to have no force and effect. We must therefore now determine whether summary judgment was proper under this standard. Our job is made easier because both parties take the position that the evidence on actual malice has been fully marshalled. Since appellant does not seek or suggest the need of further discovery, the "state of mind" problem referred to in the Chief Justice's *Hutchinson* footnote is not present.

■ But this does not mean that our preliminary analysis is at end. The rule of *Sullivan,* in addition to requiring a defamation plaintiff to prove "actual malice" in the case of public officials and public figures, requires that proof of actual malice be with "convincing clarity," 376 U.S. at 285–86, 84 S.Ct. at 728–729, a standard which is "intermediate between the normal 'preponderance of the evidence' civil standard and the 'beyond the reasonable doubt' criminal standard," *Nader v. de Toledano, supra,* 408 A.2d at 49. *See also Gertz v. Robert Welch, Inc., supra,* 418 U.S. at 342, 94 S.Ct. at 3008 (requiring "clear and convincing proof that the defamatory falsehood was made with knowledge of its falsity or with reckless disregard for the truth"). Accepting this rule, there remains the question what standard the court should use in applying the law to the facts. In a case where the defendant has moved for summary judgment on the issue of actual malice and the plaintiff claims that there remain material

factual disputes, the court decides the materiality of the disputed facts by accepting the plaintiff's version and applying the actual malice standard. This standard requires a clear and convincing showing, which may be by circumstantial evidence, of defendant's actual state of mind—either subjective awareness of probable falsity or actual intent to publish falsely. Therefore, a judge in denying a defendant's summary judgment motion must conclude that, based on the evidence asserted in the plaintiff's affidavits, "a reasonable jury *could find* malice with convincing clarity." *Nader v. de Toledano, supra,* 408 A.2d at 49 (emphasis in original); *see Guam Federation of Teachers, Local 1581 v. Ysrael,* 492 F.2d 438, 441 (9th Cir.), *cert. denied,* 419 U.S. 872, 95 S.Ct. 132, 42 L.Ed.2d 111 (1974). Under this standard we are convinced, as was Judge Owen below, that no reasonable jury could find with convincing clarity on the facts in this record that appellee, or its agents Botta and his editors and consultants, acted with actual malice in the *Sullivan-St. Amant* sense of that much-abused term.

It is clear that appellee, through its agents, made a thorough investigation of the facts. Scientific writings and authorities in the field were consulted; authoritative scientific bodies speaking for substantial segments of the medical and scientific community were investigated. The unquestioned methodology of the preparation of the article exemplifies the very highest order of responsible journalism: the entire article was checked and rechecked across a spectrum of knowledge and, where necessary, changes were made in the interests of accuracy.

Appellant's principal claim on appeal is that Botta's credibility is contested by circumstantial evidence. The House Subcommittee hearings, he argues, themselves show actual malice because they show (a) that "the reality of the fluoridation-cancer controversy among competent, learned, serious-minded scientists is beyond question," (b) that "Plaintiff did adjust his crude data for age, race, and sex," and (c) that he "is a prominent, well-recognized scientist in the

area of fluoridation." Appellant also argues that, after publication of the articles but before suit and before a licensed republication in the *Journal of the California Dental Association* in January 1979, he made available to Consumers Union the 51-page memorandum submitted in the Allegheny County case, mentioned earlier, note 9 *supra.* This "rebroadcast" of the libels, he contends, shows malice.

Treating these points seriatim, even if in the opinion of some there is a real fluoridation-cancer controversy, this does not prove actual malice on the part of Consumers Union. Indeed, appellee's expressed "opinion" to the contrary, as such, is not defamatory at all, since false or even pernicious opinions are not actionable. *Gertz v. Robert Welch, Inc., supra,* 418 U.S. at 339–40, 94 S.Ct. at 3006–3007; *Buckley v. Littell,* 539 F.2d 882, 893–94 (2nd Cir. 1976), *cert. denied* 429 U.S. 1062, 97 S.Ct. 785, 50 L.Ed.2d 777 (1977). It is only through innuendo that anything defamatory can be read into the statement that there is no "scientific controversy," about fluoridation and cancer. We will accept for the purposes of this case appellant's argument that the statement contains an innuendo that appellant's studies and statements have been amateurish and not scientifically sound, are grossly misleading, and amount to "claptrap." This innuendo casts doubt upon appellant's scientific competence and, we will assume, might be thought to raise a triable issue of fact as to whether appellant was defamed. But the House Subcommittee hearings do not on their face demonstrate that appellee was acting with reckless disregard of the facts, much less with knowledge of falsity. Dr. Yiamouyiannis and his colleague Dr. Burk have certain qualifications (though the former's claim to being an epidemiologist (Complaint ¶ 1) is not substantiated by the list of his qualifications set forth at pages 194–96 and 579 of the Hearings Record). But the hearings give clear

support for the proposition in the article that "independent investigations by seven of the leading medical and scientific organizations in the English-speaking world have unanimously refuted the National Health Federation's cancer claims." *See* Hearings Record at 90–91, 100–01; note 2, *supra.* This evidence is sufficient to exonerate appellee on the issue of actual malice with respect to the general subject of appellant's professional competence. Even if, as appellant argues, these seven studies did not address appellant's later and more sophisticated July 1977 article, the hearings contain evidence that this study was seriously flawed as well. *See* note 4 *supra.*

More specifically, with respect to appellant's two 1975 studies, the article stated that the first failed to take into account "widely recognized risk factors"—ethnic, demographic and others [10]—and the second was said to be "even more amateurish"—ignoring age, sex, and race.[11] Appellant's affidavit makes much of these remarks. But appellant does not deny that his 1975 articles did *not* take these risk factors into account—obviously there could be no actual malice if the statements were true. Moreover, his complaint that the *Consumer Reports* article did not address his subsequent 1977 article does not indicate either defamation or actual malice, especially since the later study was also suspect.[12]

In addition, the complaint argues that the Consumers Union article did not fairly show that the NCI had made a serious mathematical error, which, combined with a refusal to disclose certain procedures to appellant, amounted to a "cover-up of the fluoridation-cancer link." (Aff. of Dr. Yiamouyiannis ¶ 10). We find nothing, however, after perusal of the hearings record, that indicates that appellee's failure to discuss an NCI "cover-up" is defamatory of Dr. Yiamouyiannis, much less made with actual mal-

---

10. This was substantiated by the Hearings Record at 110–11.

11. This was substantiated by the Hearings Record at 111–13.

12. The Hearings Record substantiates that it was. See note 4 *supra.* See also Hearings Record at 218 (letter from D. J. Newell to Dr. J. Yiamouyiannis, Oct. 27, 1977).

942

ice. The error was apparently minor,[13] and the failure to disclose was merely described in Botta's article as "less sinister than some members of the British Parliament were later led to believe"—a matter of opinion, fair for public comment.

Finally, we find nothing in the memorandum in the Allegheny County case, submitted to appellee after publication but before a republication, that is sufficient to show that appellee acted with actual malice. The argument in the memorandum itself is based principally on the studies of appellant and his NHF colleagues, and therefore is hardly sufficient to demonstrate that Botta or the others at Consumers Union who allowed the republication either knew that their criticisms of appellant were false, or were reckless concerning that question.

In short, with respect to any portions of the alleged defamatory matter that are not already protected as statements of opinion, no showing has been made that they were published with actual malice, let alone a showing that achieves "convincing clarity". The order granting summary judgment must therefore be affirmed.

Judgment affirmed.

---

**13.** See notes 5 and 12 *supra*.