Rita **JENSEN**

v.

**TIMES MIRROR COMPANY, et al.**

**Civ. No. B–82–368 (PCD).**

United States District Court,
D. Connecticut.

May 6, 1986.

Daniel E. Livingston, Gregg D. Adler, Kestell, Pogue & Gould, Hartford, Conn., for plaintiff.

Hugh F. Keefe, Lynch, Traub, Keefe & Snow, New Haven, Conn., for defendants.

## RULING ON DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

DORSEY, District Judge.

As of October 21, 1981, plaintiff had been employed since January 1980 by defendant Connecticut Newspapers, Inc. ("CNI"), publisher of the Stamford *Advocate*, a daily newspaper, originally as a copy editor and then as an investigative reporter. CNI is a subsidiary of defendant Times Mirror Company ("Times Mirror"). During that time, plaintiff lived in New York with a roommate she originally knew as Lynn Adams. On October 21, 1981, plaintiff went to defendant Kenneth H. Brief ("Brief"), Executive Editor of the *Advocate*, and disclosed that her roommate was Katherine Boudin, who had gained notoriety in the 1970's, who had been underground since and who had just been identified as a participant in an armored car robbery in which three guards or police had been killed. These facts are not in dispute.

Plaintiff claims that on October 21, 1981, she informed Brief of the fact that, prior to the robbery and Boudin's arrest, she knew Boudin's true identity.[1] Brief and defendants claim that it was not until after October 21, 1981, that plaintiff first made that fact known and in the interim led them to believe that she first knew of Boudin's identity when the robbery and arrest occurred. In the interim, several articles were published by the *Advocate* on the basis of defendants' version of the facts.

1. Plaintiff's claim in this respect is based on a conversation with Brief on the night of October 21–22, 1981. She did not, in so many words, tell Brief that she knew who Boudin really was before the robbery. Rather, she claims to have suggested that was the case by language that, at best, is cloudy, perhaps evasive and, at worst, highly dubious. It is thus only arguable that plaintiff's language could reasonably be the basis for an inference that Brief was so informed. *See* Transcript of Deposition of Plaintiff, October 1, 1982, Vol. II at 306–07, Vol. III at 386. If the first news story was inaccurate in suggesting plaintiff's lack of knowledge of Boudin's true identity until after the robbery, plaintiff approved the story in the form that clearly suggests that to be the fact, although she also claims the story in the form she approved was not inaccurate. *Id.,* Vol. III at 518–20. Though the subsequent stories were, she concedes, in error, she took no steps to correct them on the ground that Brief knew of the error. She concedes she was ambiguous in what she said. Her claim that she had done nothing wrong is dubious, as her knowledge of Boudin's identity could be a factor in a potential charge of harboring a fugitive. *See* unnumbered page of Jensen Transcript of April 26, 1985, being the page just before page 1179 in defendants' exhibits. In addition, in the interview with Dick Polman, it appears that she conceded that she had withheld from her editors the fact that, for about one year (prior to the robbery), she knew Boudin's true identity, from which it follows, contrary to her claim now that she did so inform Brief, that she did not do so. *See* Exhibit 13 to defendants' brief.

On November 23, 1981, plaintiff was terminated by CNI on the stated ground that she had allowed inaccurate information (the date of her knowledge of Boudin's identity) to be published, a fact which undercut the paper's integrity. Defendants issued and printed statements to that effect with consequent publication of the termination and the stated reasons in the *New York Times* and *New York Daily News*.

Plaintiff cast a different light on the events which followed upon her first disclosure to Brief. A major thrust to her claim is that from the outset defendants wished to scoop the newsworld with an inside story on Boudin. Plaintiff's refusal allegedly was a major bone of contention. This is not a wrongful discharge case, however. It is a defamation case paired with privacy invasion/false light, with emotional distress and breach of contract claims thrown in.

Defendants, having moved for summary judgment on the defamation and false light claims in Counts One through Four, it is necessary to analyze what was published.

## I.

### A. *Advocate Articles*

#### 1. *Article of October 23, 1981 (Exhibit A)*

█ While quoting plaintiff as denying knowledge of Boudin's true identity prior to the Brink's robbery, the article contains no defamatory assertions as to plaintiff. While plaintiff has asserted that she did not deny prior knowledge of Boudin's identity and that she so informed defendants on or about October 21, 1981, the article, which could thus be found to be inaccurate, does not characterize plaintiff's assertions as untruthful nor does it suggest untruthfulness on plaintiff's part in that regard. The article contains innuendo and raises questions as to the facts of plaintiff's relationship with Boudin, but it does not state or lead one to infer any falsity on her part nor does it suggest any facts concerning plaintiff that would be destructive of her reputation. Thus, while it could be found

that defendants printed a false version of what plaintiff claims to have said, the article does not defame her. *See Cianci v. New York Times Publishing Co.*, 639 F.2d 54, 60 (2d Cir.1980); Restatement (Second), Torts §§ 558, 564.

#### 2. *Article of October 24, 1981 (Exhibit B)*

This article is not substantially different from Exhibit A and thus is not defamatory of plaintiff for the same reasons.

#### 3. *Article of October 25, 1981 (Exhibit C)*

Plaintiff is noted to have lived in Ohio in 1968, coincidentally with Boudin and plaintiff's lawyer, Martin R. Stolar, without a connection being suggested. Plaintiff reportedly retained Stolar after hearing of Boudin's identification. It reasserts plaintiff's denial of knowledge of Boudin's activities and identification. It reviews plaintiff's activities in women's rights and other causes and some of her background as quoted from her mother and a professor at Columbia. While the article is not a model of fact reporting and contains substantial innuendos in posing questions about plaintiff, there is nothing shown to be defamatory as destructive of her reputation or her journalistic integrity. *See Strada v. Connecticut Newspapers, Inc.*, 193 Conn. 313, 322–23, 327, 477 A.2d 1005 (1984).

#### 4. *Article Concerning Plaintiff's Ex-husband (Exhibit D)*

█ This is an article one would wonder why anyone bothered to write, much less publish. It reiterates plaintiff's assertion of her identification of Boudin as Lynn Adams and then, based on an interview of plaintiff's ex-husband, suggests the unlikelihood that she lacked knowledge of the true identity. It then reports several factors about Jim Jensen that suggest his view of things to be dubious. No claim is made here that Jim Jensen was not accurately quoted. There is nothing in the article that is defamatory of plaintiff.

### 5. Article of November 4, 1981 (Exhibit E)

This article is not substantially different from Exhibit A and thus is not defamatory of plaintiff for the reasons above.

### 6. Article of November 23, 1981 (Exhibit H)

■ This article characterizes information published as to the relationship of plaintiff to Boudin as inaccurate and notes plaintiff allowed it to be published though inaccurate. It also suggests that plaintiff failed to disclose the truth, withheld information and that her "ability to function" as a reporter "was irreparably damaged." It further reports that, contrary to what she had stated, plaintiff knew Boudin's identity prior to the robbery. An issue of fact exists in these respects and a jury could find the publication had a defamatory quality. This question of fact can only be determined at trial.

### B. Robert Heisler's Statements

■ 1. To *Newsday*, on or about November 5, 1981, Heisler is claimed to have said that the *Advocate* was investigating plaintiff's connection with Boudin and, as information was obtained, it was run past plaintiff, who declined to discuss it. This was partly true without doubt, as defendants' employees discussed the matter with plaintiff on several occasions. In part it was not true in that plaintiff was not afforded a review of all articles printed and particularly not the *Newsday* article of November 6, 1981, reprinted by the *Advocate* on November 8, 1981 (Exhibit F). Exhibit F is a rehash of the events which came to light after the robbery and a soft-pedaling of any materialistic motive by Brief to take advantage of plaintiff's relation to Boudin. It notes plaintiff's refusal to answer questions about her awareness of Boudin's identity, a variance from the other reports supporting an assertion of no such knowledge until the robbery. It discusses, editorially, plaintiff's decision to keep silent. Heisler's statements do not impugn plaintiff's truthfulness nor her personal or journalistic integrity and lack defamatory quality.

■ 2. To a *New York Daily News* reporter, on or about November 23, 1981, Heisler is claimed to have stated that plaintiff had allowed inaccurate information to be published in the *Advocate*. As discussed in relation to the *Advocate* November 23, 1981, article (Exhibit H), this assertion has a potential defamatory quality toward plaintiff and it will be for a jury to decide whether that is the case.[2]

### C. Brief's Statements

Defendant Brief is alleged to have stated on four occasions, on November 20, 23, and 28, 1981 (*see* complaint ¶¶ 30, 31, 33 and 36), that plaintiff allowed publication in the *Advocate* of inaccurate information. For the same reasons discussed in relation to the article of November 23, 1981 (Exhibit H) and Heisler's alleged statement to the *New York Daily News*, this charge presents questions of fact for determination by the jury.

## II.

### A. Right Of Privacy—Barred When Defamation Is Barred

■ Defendants challenge plaintiff's invasion of privacy claims on the same grounds they challenge the defamation claims, arguing that the facts of this case support no such claims. The right of privacy is the "right to be let alone." 3 Restatement (Second) Torts § 623A, comment a; Prosser, Torts (4th ed. 1971) § 117 at 804. More specifically, plaintiff claims the right not to be cast in a false light. 3 Restatement (Second) Torts §§ 652A(2)(d), 652(E). The distinction between privacy and defamation actions, based on the same facts, is that the former provides redress for the

---

**2.** Defendants assert that plaintiff has admitted that Heisler's statement was neither deliberately false nor that it was made in reckless disregard for the truth. Defendants' Claim of Undisputed Matters ¶ 95. Plaintiff has not controverted that claim in her statements of material matters in dispute.

emotional response and mental suffering for not being let alone, while the latter provides relief for the injury to one's reputation. *See Goodrich v. Waterbury Republican-American, Inc.,* 188 Conn. 107, 128 n. 19, 448 A.2d 1317 (1982). *Time, Inc. v. Hill,* 385 U.S. 374, 387–88, 87 S.Ct. 534, 541–42, 17 L.Ed.2d 456 (1967), specifically applied the standard of *New York Times Co. v. Sullivan,* 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964), to privacy claims. *See Cantrell v. Forest City Publishing Co.,* 419 U.S. 245, 249, 95 S.Ct. 465, 468, 42 L.Ed.2d 419 (1974). Both privacy and defamation claims arise from allegedly false publications and are subject to the same standards for determining the existence of a cause of action measured by the "conditional" standard, *see McCormack v. Oklahoma Publishing Co.,* 613 P.2d 737 (D.Okla.1980); *Goodrich,* 188 Conn. at 132, 488 A.2d 1317, including reference to activity which inevitably propels one into the public eye, for purposes of determining whether one "acceded to a position of public notoriety." *Id.* at 133, 488 A.2d 1317. Thus, "the right of privacy must give way when balanced against the publication of matters of public interest, in order to insure the 'uninhibited robust and wide-open' discussion of legitimate public issues." *Id.* at 134, 488 A.2d 1317, quoting *New York Times Co. v. Sullivan,* 376 U.S. at 270, 84 S.Ct. at 721.

▮ The essential elements of the claim are (1) a publication (2) about plaintiff (3) unreasonably placing her in a false light before the public. Apart from the application of the *New York Times Co.* standard, largely the same analyses of the impact of each of the publications, as was made above with respect to the defamation claimed based on the same publications, would apply to the claims of invasion of privacy/false light. The same results with respect to the privacy claims are reached here as in the review of the claims for defamation above. Accordingly, plaintiff

may not recover against defendants on her claim of invasion of privacy based on the articles of October 23, 24, 25, and November 4, 1981, nor Heisler's statement of November 5, 1981.

Accordingly, defendants' motion for summary judgment is granted with respect to Counts One and Two, as it is based on the *Advocate* articles of October 23, 24, 25, and November 4, 1981 (both Exhibits D & E), and on Heisler's statement of November 5, 1981. Otherwise, with respect to Counts One and Two, it is denied.

Defendants' motion for summary judgment as to Counts Three and Four is denied.

### III.

#### A. *Plaintiff Was a Public Figure*

▮ The first amendment encourages vigorous and uninhibited debate about matters of public concern. The accommodation of that purpose must be counterbalanced by the need to protect individual reputations. Thus, greater latitude is extended to comment with respect to public officials and public figures than to comment about mere individuals. *Gertz v. Robert Welch, Inc.,* 418 U.S. 323, 344–45, 94 S.Ct. 2997, 3009–10, 41 L.Ed.2d 789 (1974). Thus, a greater burden falls upon a public officer or public figure in that he must prove actual malice in any defamation. Accordingly, a plaintiff must be determined to be either a public or private figure. Positive action seems required before an individual is deemed a public figure and required to prove actual malice before recovering for defamation. In defining "public figures," courts use the phrases "have assumed roles of especial prominence in the affairs of society," "occupy positions of such persuasive power and influence," "thrust themselves to the forefront of particular public controversies in order to influence the resolution of the issues involved," and "they invite attention and comment." [3] *Id.*

---

**3.** Whether one is a public figure is a matter for determination by the court. *Hotchner v. Castillo-Puche,* 404 F.Supp. 1041, 1045 (S.D.N.Y.1975),

*rev'd on other grounds,* 551 F.2d 910 (2d Cir.), *cert. denied,* 434 U.S. 834, 98 S.Ct. 120, 54

at 345, 94 S.Ct. at 3009 *cf. Hutchinson v. Proxmire*, 443 U.S. 111, 99 S.Ct. 2675, 61 L.Ed.2d 411 (1979) (legitimate public interest in expenditure of public funds does not constitute a basis for holding a recipient to be a public figure).

■■■ The Supreme Court has manifested a restrained approach, an unwillingness to extend the protection of the *New York Times Co.* standard broadly, as unnecessary to promote or protect public debate as intended by the first amendment. Justice Blackmun notes in his concurring opinion in *Gertz* the plurality opinion which he joined in *Rosenbloom v. Metromedia, Inc.*, 403 U.S. 29, 91 S.Ct. 1811, 29 L.Ed.2d 296 (1971), would have extended the *New York Times Co.* doctrine to "an event of public or general interest," *Gertz*, 418 U.S. at 353, 94 S.Ct. at 3013, though he agreed that the majority of the Court felt to the contrary, as they did in *Gertz* in refusing to extend the doctrine to cover private individuals. *Id.* Thus, defendants, as in *Gertz*, although not protected to the extent of the *New York Times Co.* doctrine, have "an adequate safeguard for the constitutionally protected interests of the press and [are afforded] ... a tolerable margin for error by requiring some type of fault," even where a private figure is involved. *Time, Inc. v. Firestone*, 424 U.S. 448, 457, 96 S.Ct. 958, 966, 47 L.Ed.2d 154 (1976). Association with matters or "controversies of interest to the public" does not of itself make one a public figure. *Id.* at 454, 96 S.Ct. at 965. Likewise, one is not a public figure if she is "drawn into a public forum *largely against [her] ... will.*" *Id.* at 457, 96 S.Ct. at 967 (emphasis added). Plaintiff's commenting in response to the publication is not, however, enough to make her a public figure, for defendants may not act so as to create a public figure status and obtain the attendant enhanced protection that would be given to their publications.

■■ In contrast, one may become a public figure (a) by virtue of "pervasive fame or notoriety" or (b) "[m]ore commonly [by] ... voluntarily inject[ing] [one]self

or [being] drawn into a particular public controversy." *Gertz*, 418 U.S. at 351, 94 S.Ct. at 3009. A private individual ordinarily "has not accepted public office nor assumed an influential role in ordering society," i.e., has not occupied a role of "especial prominence in the affairs of society." *Id.* at 345, 94 S.Ct. at 3013. Public figures are numerous and include one "who is famous or infamous because of who he is or what he has done." *Cepeda v. Cowles Magazines & Broadcasting, Inc.*, 392 F.2d 417, 419 (9th Cir.), *cert. denied*, 393 U.S. 840, 89 S.Ct. 117, 21 L.Ed.2d 110 (1968). *See Rosanova v. Playboy Enterprises, Inc.*, 411 F.Supp. 440 (S.D.Ga.1976), *aff'd*, 580 F.2d 859, 861 (5th Cir.1978) (Rosanova could not deny public figure status, since he "voluntarily engaged in a course that was bound to invite attention and comment," i.e., his contacts and involvements with the subject of the article.). In sum, a person may not choose whether or not he/she is to be a public figure in disregard of one's actions.

■■ Plaintiff concedes her presence within the social circle of her roommate, with whom she continued to live after learning of her true identity, as one upon whom the public and the media had focused considerable attention long before the Brink's robbery. Thus, plaintiff placed herself in a relationship in which, inevitably, substantial public interest would be found. As a journalist, the inevitable likelihood of public and media interest was inescapable to her. *See* Transcript of Plaintiff's Deposition at 719–20, 745. On the other hand, mere public and media interest in an event and the persons related to it does not, for first amendment and defamation purposes, create a public figure. In this case, plaintiff engaged in interviews which were known to be incorporated into news stories. Even though these were conducted by her fellow employees, their significance is not vitiated by her claim of being pressured to do so. The fact is, she did it. She concedes that she has at least

L.Ed.2d 95 (1977); *Rosenblatt v. Baer*, 383 U.S. 75, 88, 86 S.Ct. 669, 677, 15 L.Ed.2d 597 (1965).

acquiesced in a movie on the subject. As articulated above, a positive course of action is required before one can be deemed to have brought themselves into the public focus sufficient to be a public figure, measured by "the nature and extent of an individual's participation in the particular controversy giving rise to the defamation." *Lerman v. Flynt Distributing Co.*, 745 F.2d 123, 136 (1984), quoting *Gertz*, 418 U.S. at 352, 94 S.Ct. at 3013; *Wolston v. Reader's Digest Ass'n*, 443 U.S. 157, 167, 99 S.Ct. 2701, 2707, 61 L.Ed.2d 450 (1979). The question now is whether plaintiff, by her actions, "must be deemed to have purposefully surrendered part of what would otherwise have been her protectable privacy rights," *Lerman*, 745 F.2d at 137, and has injected herself into a "public controversy," which is "any topic on which sizeable segments of the comments have different, strongly held views."[4] *Id.* at 138. Plaintiff may not, however, invoke the four prong test of *Lerman, id.* at 136–37, because, unlike Lerman, plaintiff here had not injected herself into the public focus by actively seeking publicity, by writing and selling books, though she did write for public consumption.[5] Largely, as a limited public figure, Jensen was bathed with the reflected light of her chosen roommate's notoriety, which was substantially raised in intensity by Boudin's involvement in the Brink's robbery. While there is nothing to suggest that plaintiff knew of the robbery beforehand, all of the alternatives to Boudin's life bubbled with potential notoriety. If Boudin came above ground, if she engaged in repetition of her prior reputed activities, the media and the public would

focus on Boudin and inevitably plaintiff. Thus, somewhat akin to the plaintiff in *Rosanova*, 411 F.Supp. 440, plaintiff's choice of associates, against the background of Boudin's notoriety, exposed her to the potential of public and media interest. Nor was this course of conduct bereft of active choices, unlike Firestone, who, though notorious in the view of some, was only newsworthy because of her private conduct which interested the public, probably because of its reputed salaciousness.[6] *Time, Inc. v. Firestone*, 424 U.S. 448, 96 S.Ct. 958, 47 L.Ed.2d 154.

This distinction is best drawn between *Wolston v. Reader's Digest Ass'n*, 443 U.S. 157, 99 S.Ct. 2701, 61 L.Ed.2d 450, where the plaintiff took no active steps into an area of public interest and was held not to be a public figure despite public interest in the conduct of his aunt and uncle, and *Rosanova*, 411 F.Supp. 440, where plaintiff actively chose the associations which resulted in reflected focus on him. "If a position itself is so prominent that its occupant unavoidably enters the limelight, then a person who voluntarily assumes such a position may be presumed to have accepted public figure status." *Marcone v. Penthouse Internat'l Magazine*, 754 F.2d 1072, 1083 (3d Cir.1985). *See also Barger v. Playboy Enterprises, Inc.*, 564 F.Supp. 1151, 1156 (N.D.Cal.1983) (wives of Hell's Angels members), *aff'd*, 732 F.2d 163 (9th Cir.), *cert. denied*, —— U.S. ——, 105 S.Ct. 175, 83 L.Ed.2d 110 (1984). While this case does not involve a controversy in the sense of a disputed issue, it nonetheless involves

---

4. There is no requirement that the publications meet an independent standard of newsworthiness to obtain the first amendment protection, *Lerman*, 745 F.2d at 138, the trap the *Gertz* court refused to fall into in refusing to use a subject matter standard (orientation).

5. The malice requirement only applies where persons choose to place themselves directly and/or foreseeably in the public and media focus, since their voluntary action invited public attention and comment. *Compare New York Times Co. v. Sullivan* (municipal commissioner required to prove malice in publication of criticism of his official conduct) *with Dun & Brad-*

*street, Inc. v. Greenmoss Builders, Inc.*, 472 U.S. ——, 105 S.Ct. 2939, 86 L.Ed.2d 593 (1985) (private plaintiff need not show malice where speech is of purely private concern).

6. It should be noted that by the time this action was brought, the damage of which plaintiff complains was done. Her status is not to be evaluated in light of her news conference when she brought suit on June 23, 1982, nor her voluntary appearance on television on March 23, 1984, for her public figure status is determined as of the time of the alleged publications, though her conduct thereafter might be relevant on the issue of damages.

plaintiff's relationship with Boudin, which was controversial in the sense of provoking public discussion of the propriety of the relationship and whether it constituted endorsement and support of Boudin's unorthodox behavior, made all the more so by plaintiff's continuation of the relationship after she knew her roommate's true identity.

While this is not a clear-cut case, considering plaintiff's course of action, the choices she made in remaining as Boudin's roommate, the inevitability of publicity if Boudin's location were revealed, her interview and the publication of the intended news story resulting therefrom and her relationship to and knowledge of Boudin's identity require a finding that, for a limited purpose, which includes the publications in question, plaintiff was a public figure.

### IV.

#### A. *Proof of Actual Malice*

■■■■ Defendants argue that plaintiff has the burden of proving, with convincing clarity, actual malice in publishing a false statement concerning plaintiff, proving malice by knowledge of the falsity or by reckless disregard of whether or not it was false. *New York Times Co. v. Sullivan*, 376 U.S. at 279–80, 84 S.Ct. at 725–26. The rule is applicable to both public figures and public officials. *Curtis Publishing Co. v. Butts*, 388 U.S. 130, 162–65, 87 S.Ct. 1975, 1995–96, 18 L.Ed.2d 1094 (1967). Reckless disregard for the truth may be tested by whether "defendant in fact entertained serious doubts as to the truth of his publication," *St. Amant v. Thompson*, 390 U.S. 727, 731, 88 S.Ct. 1323, 1325, 20 L.Ed.2d 262 (1968), or by whether defendant was aware to a high degree "of probable falsity." *Id.* 731, 88 S.Ct. at 1325; *Garrison v. Louisiana*, 379 U.S. 64, 74, 85 S.Ct. 209, 215, 13 L.Ed.2d 125 (1964); *Moriarty v. Lippe*, 162 Conn. 371, 380, 294 A.2d 326 (1972).

■■■■ Nonetheless, plaintiff's burden is to offer "evidence of some fault on the part of a defendant charged with publishing de-

famatory material," *Time, Inc. v. Firestone*, 424 U.S. at 461, 96 S.Ct. at 968, citing *Gertz*. "[S]o long as they do not impose liability without fault, the States may define for themselves the appropriate standard of liability for a publisher or broadcaster of defamatory falsehood injurious to a private individual." *Gertz*, 418 U.S. at 347, 94 S.Ct. at 3010. The *Gertz* court intimated no view as to the proper resolution of a case where a state conditioned liability on "a factual misstatement whose content did not warn a reasonably prudent editor or broadcaster of its defamatory potential," *id.* at 348, 94 S.Ct. at 3011, but noted the limitation of liability to the situation in which the substance of the defamatory statement " 'makes substantial danger to reputation apparent.' " *Id.*, quoting *Curtis Publishing*, 388 U.S. at 155, 87 S.Ct. at 1991.

Plaintiff asserts that prior to any news articles she stated to defendants that she knew Boudin as Boudin before the Brink's robbery. Defendants have many arguments and at least four witnesses as well as documents on which they premise the claim that plaintiff cannot credibly meet her burden of proof. If plaintiff were to be believed, defendants could be found to have published the stories knowingly to the false effect that plaintiff had not known Boudin as such before the robbery, that she allowed those false stories to be published when she did know Boudin as such before the robbery and that defendants knew as of October 21, 1981, that the contrary was true. Based on plaintiff's claims, defendants' characterization of plaintiff's statements and her allowing false information to be published could be found to have been defamatory. Defendants could also be found to have known that they were defamatory. Whether the level of that knowledge and the ensuing publication so characterizing plaintiff's conduct meets the standards required by the Supreme Court requires an assessment of the minds which decided the content of the publications. *See Herbert v. Lando*, 441 U.S. 153, 160, 99 S.Ct. 1635, 1640, 60 L.Ed.2d 115 (1979). That is a matter of

inference. To hold, in the face of a motion for summary judgment, that plaintiff's own testimony, which if believed could establish falsity, would be insufficient to prove constitutional malice disregards the jury's function of weighing the evidence and determining credibility. A reasonable jury could credit plaintiff and reject all of defendants' evidence, partly on the basis of the appearance and presentation of the witnesses. While plaintiff's evidence is diminutive in contrast to what defendants appear prepared to offer, it is not so lacking in probative value, by itself or by contrast to the countering quality of defendants' evidence and arguments concerning the quality of plaintiff's testimony, as to require or permit the court to reject it.[7]

Defendants' reliance on *Long v. Arcell*, 618 F.2d 1145 (5th Cir.1980), *cert. denied*, 449 U.S. 1083, 101 S.Ct. 869, 66 L.Ed.2d 808 (1981), is misplaced for there "the only testimony as to defendant's state of mind was that of two witnesses who testified such that if believed defendants would be found to have known the facts to be contrary to what they published." *Id.* at 1148. It is difficult to reconcile the function of the jury and plaintiff's right to have a jury discharge that function, i.e., to decide questions of fact, with the determination of the Fifth Circuit. "This record simply does not contain clear and convincing evidence that the defendants knew that their information was incorrect or had a 'high degree of awareness of ... [its] probable falsity.' *Garrison v. Louisiana*, 379 U.S. 64, 74, 85 S.Ct. 209, 215, 13 L.Ed.2d 125 ...." *Long v. Arcell*, 618 F.2d at 1148. That holding would authorize if not require a court to rule that the testimony of two witnesses, probative of a defendant's knowledge of the falsity of what he printed, was insufficient to be a basis for a finding by a jury of actual malice in a false publication. There the trial judge so decided and was sustained on appeal. It is the view of the undersigned that on a motion

for summary judgment the testimony of but one witness, with some reasonable basis for credibility, is sufficient to require a jury to decide whether plaintiff has met her burden and she cannot be deprived of her right to a jury trial in such case. Of course, the trial and appellate decision in *Long* came after trial when a different perspective on the evidence existed. This court concludes that the undisputed facts and plaintiff's claims, if credited, could permit "a reasonable jury [to] find malice with convincing clarity." *Yiamouyiannis v. Consumer Union*, 619 F.2d 932, 940 (2d Cir.1980). The jury, to find for plaintiff, need find only that plaintiff did disclose her knowledge of Boudin's identity prior to the robbery and defendants falsely used an asserted denial/nondisclosure of that knowledge as a claimed basis for its articles. This is a close case on the record presented. Deference to plaintiff's right to trial and the finality of a jury verdict are significant. It cannot now be found that a reasonable jury could not find the facts requisite to a recovery by plaintiff.

## V.

A. *False Light/Added Libel Claims Barred by Statute of Limitations*

The publications took place in October and November of 1981. No allegation of violation of her right to privacy/false light rights was made until the March 4, 1984, proffered amendment to the complaint. Neither were the defamation claims based on the Heisler statements nor the three articles of October 23, 24 and November 4 alleged in the earlier complaints. Defendants claim these are barred by the statute of limitations, Conn.Gen.Stat. § 52–597, Connecticut's two year limitations for libel and slander actions and because these amendments should not relate back to the earlier complaint. Plaintiff argues that Connecticut's three year statute, Conn.Gen. Stat. § 52–577, applies and the amendment, filed within three years, relates back under Rule 15(c), Fed.R.Civ.P.

---

7. The court has the duty of determining whether "the statements in issue and the circumstances under which they were made ... are of a character" to be protected by the first amendment, but this must be "an independent examination of the whole record." *New York Times Co. v. Sullivan*, 376 U.S. at 285, 84 S.Ct. at 729.

■ Connecticut has provided periods of limitations for specific causes of action, Conn.Gen.Stat. §§ 52–573 *et seq.*, Chapter 926. *See* § 52–575 (entry . upon land); § 52–589 (forcible entry); § 52–597 (actions for libel and slander). Section 52–577 sets a three year limit for an "action founded upon a tort." This applies generally to torts and is not cast in terms of torts not otherwise covered. Unless a claim is covered by another, specific section, § 52–577 would control. *Collens v. New Canaan Water Co.*, 155 Conn. 477, 234 A.2d 825 (1967). Plaintiff's false light claim would then not be barred as brought within the three years. *See Fouts v. Fawcett Publications, Inc.*, 116 F.Supp. 535 (D.Conn. 1953); *Hazlitt v. Fawcett Publications, Inc.*, 116 F.Supp. 538 (D.Conn.1953). Connecticut's Supreme Court recognized the right of privacy as a lawful claim in *Goodrich v. Waterbury Republican*, 188 Conn. 107, 488 A.2d 1317 (1982). Since then, the Legislature has not acted to put this claim under § 52–597 (libel and slander). It is not the same as the specific claims covered by § 52–597. The false light claim thus is covered by § 52–577, the all-embracing tort statute of limitations.

■ Further, the false light claims made by plaintiff are based on the same facts. A slightly different theory supported the original claim, filed within the statutory period, and as reliant upon the same "conduct, transaction or occurrence" the false light claim relates back to the original claim for statute of limitation purposes. Rule 15(c), Fed.R.Civ.P. *Siegel v. Converters Transp., Inc.*, 714 F.2d 213 (2d Cir.1983). Defendants clearly had notice of the conduct on which plaintiff relied in the original complaint. The amendment merely changed her theory. The false light claims are not barred.

The publications in the *Advocate* of October 23, 1981 (Exhibit A), October 24, 1981 (Exhibit B), October 25, 1981 (Exhibit C), and the statements of Heisler on or about November 5, 1981, to *Newsday* and on or about November 28th to the *New York Daily News*, were first alleged to be defamatory in the Amended Complaint of March 5, 1984. Each publication gives rise to a distinct, separate cause of action. Connecticut Gen.Stat. § 52–597 specifically bars a libel or slander cause of action unless brought within two years of publication. If deemed brought when first alleged in March 1984, the claims based on the October 23, 24, 25, 1981, articles and Heisler's statements would be barred.

Rule 15(c), Fed.R.Civ.P., deems an amendment asserting a claim which "arose out of the conduct, transaction or occurrence attempted to be set forth in the original pleading," to relate back to the original pleading. It is clear that all of plaintiff's defamation claims arose in the period from October 21, 1981, with her first disclosure of her relationship with Boudin to late November 1981 after she was terminated and several publications concerning the termination occurred. As defendants correctly assert, there is no mention of any of the publications here under discussion nor any claim of liability based thereon until the Amended Complaint of March 4, 1984. Yet what plaintiff claims is that starting on October 21, 1981, defendants undertook several courses of action, culminating in, now, nine causes of action alleged in Counts One through Nine of the Amended Complaint of June 14, 1984. A natural sequence of events for that period is outlined in the complaint and has been since the original complaint. Nonetheless, until March 4, 1984, defendants were not on specific notice of claims of libel/slander based on the five noted publications.

A complaint is intended, in this regard, to be "a short and plain statement of the claim showing the pleader to be entitled to relief." Rule 8(a)(2), Fed.R.Civ.P. A defendant is entitled to notice of the facts on which a claim is based and of the fact of such a claim. While defendants' attention was, from the outset of this litigation, called to the events of the period alleged, it was not apprised of the specific claims added on March 4, 1984.

■ Defendants argue that each publication is a separate cause of action which precludes relating back of subsequently pleaded, separate publications.

*Hartman v. Time, Inc.,* 166 F.2d 127, 136 (2d Cir.), *cert. denied,* 334 U.S. 838, 68 S.Ct. 1495, 92 L.Ed. 1763 (1948). *See* 6 Wright & Miller, *Federal Practice and Procedure* § 1497, at 489–90; 3 Moore's, *Federal Practice* ¶ 15.15[3]. Plaintiff alleged originally the facts within the same time span now claimed. Included was a claim of defamation based on a November 23 publication that inaccurate information was allowed to be published. As plaintiff's claims of factual defamation in the three October articles and Heisler's statement of November 5, 1981, are not the same as the original claim and facts other than those originally pleaded are the basis for the added claims, the claims based on the three articles of October 23, 24 and 25, and on Heisler's statement of November 5, 1981, do not arise from the same "transaction, occurrence or conduct" and are barred by the statute of limitations and not saved therefrom by Rule 15(c). *See Pendrell v. Chatham College,* 386 F.Supp. 341, 346 (W.D.Pa.1974). The claim as to Heisler's statement of November 28, 1981, is, however, an assertion of the same factual misstatement, though on a slightly different date but is within Rule 15(c) and thus not barred.

SO ORDERED.