**CONTEMPORARY MISSION, INC., et al., Plaintiffs,**

v.

**The NEW YORK TIMES COMPANY, Defendant.**

**No. 80 Civ. 6587 (VLB).**

United States District Court, S.D. New York.

July 10, 1987.

Father John O'Reilly, pro se.

William O'Reilly, Westport, Conn., for plaintiffs.

James C. Goodale, John G. Koeltl, Debevoise & Plimpton, New York City, for defendant.

## MEMORANDUM ORDER

VINCENT L. BRODERICK, District Judge.

### I.

This defamation action arises from the publication in the November 1, 1980 edition of *The New York Times* of an article entitled "Westport Priests Beset by Church and U.S. on Status" (the "article"). The subjects of the article were the plaintiffs, Contemporary Mission, Inc. ("Contemporary Mission"), a not-for-profit organization of Catholic priests based in Westport, Connecticut, and four of its five member-priests.

In their original complaint, plaintiffs alleged diversity jurisdiction, challenged

three statements in the *Times* article as libelous, and asked for $20 million in damages. They amended their complaint two weeks thereafter to claim that a fourth statement in the *Times* article was libelous. Plaintiffs 18 months later sought and were granted permission to file a second amended complaint ("SAC") which added 10 additional claims of libel.

The allegedly defamatory article was written about Contemporary Mission and its priests by *Times* reporter Diane Henry. The article's principal content, and its thrust, have been succinctly summarized by Judge Friendly:

> The article said, *inter alia*, that church officials in St. Louis, led by John Cardinal Carberry, had accused the priests of forging documents for their ordinations; that Monsignor Cusack of the Bridgeport, Conn. Diocese had written that the priests were not recognized by the diocese and were unable to function as Catholic priests; that in 1977 the State of Connecticut had gotten a cease and desist order against them for failing to deliver merchandise; that the Postal Service had charged them with fraud in the sale of bath-oil; that Father John O'Reilly had married, which would normally mean his excommunication from the Roman Catholic Church, but that he said he had switched to the Eastern Rite of the Catholic Church which allows priests to marry; and that the Mission's public court record "raises questions about whether the priests may have cloaked a profitable business in the guise of a religious, tax-exempt organization." Plaintiffs allege that these and other statements are false or so incomplete as to convey a misleadingly false impression.

*O'Reilly v. New York Times Co.*, 692 F.2d 863, 864 (2d Cir.1982).

After a series of discovery motions and pretrial conferences, and prior to the filing of the second amended complaint, defendant The New York Times Company (the "Times") filed a motion for summary judgment which was addressed to the first amended complaint. Soon thereafter, one of the individual plaintiffs, Rev. John T.

O'Reilly, applied to this court for leave to discharge his attorney and to proceed *pro se*. I denied the application. The Court of Appeals reversed. *O'Reilly v. New York Times Co.*, 692 F.2d 863 (2d Cir.1982). Thereafter defendant renewed its motion for summary judgment, this time addressed to the second amended complaint. I denied plaintiffs' request for further discovery, except for that for which plaintiffs could demonstrate a need pursuant to Fed. R.Civ.P. 56(f), and I denied plaintiffs' motion to reargue this issue two weeks later. I subsequently held oral argument on the motion for summary judgment, and reserved decision.

## II.

Contemporary Mission is a religious group which makes "religious communication [its] mission, apostolate and profession." The four individual plaintiffs are officers and directors of Contemporary Mission and have been members of Contemporary Mission since its incorporation in 1968.

In the late 1960's, several members of Contemporary Mission became "a nationally known folk-rock" group called "The Mission Singers." *Robert Stigwood Group Ltd. v. O'Reilly*, 346 F.Supp. 376, 379 (D.Conn.1972). More recently, Contemporary Mission has operated a mail order business which has brought it into conflict with various government agencies.

### A. *Plaintiffs' Religious Controversy*

In 1968, the individual plaintiffs, who had been associated with the Montfort Fathers in St. Louis, left the Montfort Fathers in a dispute over instruction at the seminary. A debate ensued as to whether the departure was voluntary. The St. Louis Archdiocese issued a news release stating that plaintiffs no longer represented the Montfort Fathers. This release was "publicized by nationwide and worldwide news wire services" as a result, according to Contemporary Mission, of "the fame and popularity" of the group stemming from its musical efforts.

When plaintiffs left the Montfort Fathers in 1968, three of them had not yet been ordained as Roman Catholic priests. Over the next three years, plaintiffs contacted approximately 30 bishops, seeking one who would ordain those three as priests. In May, 1971 they were ordained in Cromwell, Connecticut by Bishop Peter Sarpong of Ghana. The ordination occasioned extensive controversy, including allegations and counter allegations by Church officials in St. Louis and by the plaintiffs, all of which were reported by the press.

The majority of the allegedly libelous statements in the November 1, 1980 *Times* article are related to this controversy, which intensified on July 16, 1971 when the *St. Louis Review*, an Archdiocesan newspaper, published several allegedly forged letters and a disputed transcript that the *St. Louis Review* stated had been submitted to Bishop Sarpong with respect to the plaintiffs' ordination. The plaintiffs then accused Cardinal Carberry of manipulating the Catholic press in St. Louis. An August 3, 1971 letter from the plaintiffs to Cardinal Carberry illustrates the public nature of the controversy: "[t]hanks to you, we have now become celebrities, almost household words. All the publicity you've given us—free of charge!—has helped our group immensely. We've been on so many radio talk shows, we've done so many television interviews in depth, that we can no longer keep track of it all."

### B. *Plaintiffs' Artistic Careers*

As noted, some of the members of Contemporary Mission had formed a musical group called The Mission Singers, which used music as a means of expressing religious beliefs. The Mission Singers made some 18 record albums and gave more than 200 concerts in over 38 states. One of the plaintiffs said that "[a]s the 'singing seminarians,' the world has seen them on ... every major and independent network."

Plaintiffs for two years published a syndicated column in over 50 newspapers. The individual plaintiffs have appeared on various network television programs and on local television and radio shows in many states. They have also published books and articles on contemporary religious life. *Robert Stigwood Group Ltd.*, 346 F.Supp. at 379. These television and radio appearances took place prior to 1974. Since then, there have been no media appearances by any member of Contemporary Mission, and The Mission Singers are no longer active.

### C. *Plaintiffs' Mail Order Business*

Plaintiffs have in more recent years run a mail order business which has brought them into conflict with a variety of governmental agencies.

Between 1976 and 1980 plaintiffs dispatched over 12 million mail pieces with respect to, or offering, various "self-improvement" products.

Contemporary Mission's business practices have been investigated by the Bridgeport Better Business Bureau, the Westport Chamber of Commerce, and the Westport Police Department. In February, 1979 the Connecticut Department of Consumer Protection ("CDCP") issued an administrative complaint against Contemporary Mission charging that it had "accepted mail orders and payments for its merchandise and then failed to deliver either the ordered merchandise or refunds within a reasonable period of time." Contemporary Mission ultimately consented to a cease and desist order in which, while denying any wrongdoing, it agreed to cease the challenged practices.

In September, 1979 the Internal Revenue Service ("IRS") suspended Contemporary Mission's non-profit status. Several of the products which Contemporary Mission offered to the public have been removed from the market as a result of efforts by the Postal Service pursuant to 39 U.S.C. § 3005, which forbids "obtaining money or property through the mail by means of false representations."

In 1979, Contemporary Mission sued the Postal Service, seeking $1 million from Postal Service officials for alleged violations of its constitutional rights. In June, 1980 the Postal Service revoked Contemporary Mission's non-profit mailing permit on

the ground that "[i]t does not appear that the primary purpose of Contemporary Mission is religious." After a preliminary injunction was issued preventing sales of one of the products, Contemporary Mission agreed to discontinue permanently the promotional activities which were challenged. *See Contemporary Mission, Inc. v. United States Postal Service*, 648 F.2d 97, 101 n. 2 (2d Cir.1981). Contemporary Mission's suit against the Postal Service was thereafter dismissed, and the Court of Appeals affirmed the dismissal.

### III.

Plaintiffs have alleged in the second amended complaint that the following 14 statements in the article are libelous:

1. Church officials in St. Louis, led by John Cardinal Carberry, accused the priests [of the Mission] of forging documents for their ordinations. ¶ 9.

2. In a recent interview, Msgr. Andrew T. Cusack, an official with the Bridgeport (Ct.) Diocese, which now has jurisdiction over the mission (sic) priests, said they were 'inactive' and 'seeking reconciliation.' In a letter to the Government, he also said they were not recognized by the diocese and were 'unable to function as Catholic priests.' But the Postal Service says it has another letter, allegedly sent by the monsignor, that says 'their ordination and current canonical efforts have the full recognition of the church.' The monsignor has denied writing that letter. ¶ 11.

3. But in 1977, the State of Connecticut got a cease and desist order against them for failing to deliver merchandise. ¶ 13.

4. Ordinations Called Forged ¶ 15.

5. The group's activities prompted some church officials to call them clerical dilettantes, and Cardinal Carberry refused to ordain them. Father Berkery had already been ordained, and the others were ordained in 1971 in Connecticut by a visiting Bishop from Ghana.

But that same year the Bishop, the Most Rev. Peter K. Sarphong [sic] later wrote to the Vatican saying he had been 'misled' when he accepted documents supporting the ordinations of the priests, which St. Louis officials said had been forged.

The mission priests disclaimed knowledge of the forged documents, and they accused Cardinal Carberry, who is now retired, of conducting a smear campaign against them.

Since then the priests have been in a kind of canonical limbo, and it is difficult to clearly determine their status. ¶ 17.

6. In a separate action, the Postal Service charged them with fraud in the bath-oil sales. ¶ 19.

7. As evidence of the honesty of their operation, the priests point to a Federal report saying the United States Attorney's office in Connecticut had declined, in January 1979, to prosecute charges of mail fraud against them because "the firm does supply the products in most instances." ¶ 21.

8. Father O'Reilly later married the lead singer in the touring company and is now divorcing her. ¶ 23.

9. Under normal circumstances, Father O'Reilly's marriage would mean his automatic excommunication from the church, according to experts on canon law. But Father O'Reilly said he had switched to the Eastern Rite of the Catholic Church, which allows married priests. ¶ 25.

10. Five Roman Catholic priests whose religious status is being challenged by officials of their own church, as well as by three Federal agencies, say they have been misunderstood and harassed because they are unconventional clerics. ¶ 27.

11. The priests, who insist they are not rich, argue that there is no law prohibiting churches from running a mail order house, that they run an honest business and have used the money to finance their work. Yet the Mission's vast public court record with the Government, individuals and corporations raises questions about whether the priests may have cloaked a profitable business in the

guise of a religious, tax-exempt organization. ¶ 29.

12. The priests say that the mission [sic] is a pious society and that its members perform all traditional priestly functions and good works, but other priests contradict them. ¶ 31.

13. In St. Louis a decade ago, the seminarians dreamed of using profits from their musical talents to support their labors for the poor. ¶ 33.

14. Father O'Reilly and Father Berkery said they had conducted many services at St. Catherine's Church in Greenwich, but the pastor of the church, the Rev. Vincent J. O'Connor, contradicted them. ¶ 35.

The allegedly libelous statements can be categorized as follows: (1) *The Religious Controversy:* statements 1, 2, 4, 5, 12, 13, and 14 deal exclusively with the religious controversy surrounding plaintiffs; (2) *The Business Controversy:* statements 3, 6 and 7 pertain solely to the business controversy surrounding plaintiffs; (3) *Hybrid statements:* statements 10 and 11 pertain to both the religious and the business controversy; and (4) *Father O'Reilly's marital status:* statements 8 and 9 address the marital status of one of the individual plaintiffs.

## IV.

Defendant in this libel action first seeks to dismiss the 10 allegations added by the plaintiffs in their second amended complaint, on the ground that they are barred by the New York statute of limitations. *See* N.Y.C.P.L.R. § 215(3) (McKinney 1972). Plaintiffs argue that the "relation back" doctrine of Rule 15(c) of the Federal Rules of Civil Procedure permits the amendments that are in dispute.

In a June 23, 1982 hearing, I allowed plaintiffs to file a second amended complaint to their complaint but I did not specifically address the question of whether any or all of the 10 new claims in the proposed second amended complaint would be time-barred. I now deny the defendant's motion to dismiss the second amended complaint on statute of limitations grounds,

and for the reasons set forth below hold that adequate notice had been given so that plaintiffs' second amended complaint relates back to the time of the commencement of the action.

"While state law must be applied in a diversity case to determine whether an action is barred by the statute of limitations, *Guaranty Trust Co. v. York,* 326 U.S. 99, 65 S.Ct. 1464, 89 L.Ed. 2079 (1945), most courts considering the issue have held that the federal rule as to relation back applies even in a diversity case, since the question of relation back of amendments to pleadings is properly a matter of practice and procedure and is specifically dealt with in the Federal Rules of Civil Procedure." *Holdridge v. Heyer-Schulte Corp. of Santa Barbara,* 440 F.Supp. 1088, 1093 (N.D. N.Y.1977) (*citations omitted*); *see also* 6 Wright & Miller, *Federal Practice and Procedure:* Civil § 1503 at 535 (1971). "In general, if a question is covered by a provision of the Federal Rules of Civil Procedure, the federal rule rather than state law will control." *Holdridge,* 440 F.Supp. at 1093 n. 2, *citing Hanna v. Plumer,* 380 U.S. 460, 85 S.Ct. 1136, 14 L.Ed.2d 8 (1965). I therefore apply the federal rule as to the "relation back" issue.

Under Rule 15(c), an amendment relates back to the date of the original pleading whenever "the claim or defense asserted in the amended pleading arose out of the conduct, transaction, or occurrence set forth or attempted to be set forth in the original pleading." In deciding whether an amendment relates back, the principal inquiry is whether adequate notice has been given to the opposing party "by the general fact situation alleged in the original pleading." *Rosenberg v. Martin,* 478 F.2d 520, 526 (2d Cir.1973), *cert. denied,* 414 U.S. 872, 94 S.Ct. 102, 38 L.Ed.2d 90 (1973) *citing Snoqualmie Tribe v. United States,* 372 F.2d 951, 960, 178 Ct.Cl. 570 (1967). *See also Schiavone v. Fortune,* 477 U.S. 21, 106 S.Ct. 2379, 2385, 91 L.Ed.2d 18 (1986) ("linchpin is notice" within limitations period). An amendment will not relate back if it sets forth a new set of operational facts. *Holdridge,* 440 F.Supp.

at 1093. It can, however, make more specific what has already been alleged. *Id.*

Because there is only the November 1, 1980 article in question, there is only one "transaction or occurrence" giving rise to the complaint. *Compare Jackson v. Ideal Publishing Co.,* 274 F.Supp. 318, 320 (E.D. Pa.1967) (*separate* publication of a libelous statement found to be an "entirely different transaction" for amendment purposes); *Jensen v. Times Mirror Co.,* 634 F.Supp. 304, 314–15 (D.Conn.1986). While the 10 additional statements in the second amended complaint which are alleged to be libelous do not always involve the same sets of facts as do the three (and then four) matters originally alleged to be libelous, there is a "common core of operative facts" in the amended and the second amended complaints. 6 Wright & Miller, *Federal Practice and Procedure:* Civil § 1497 at 495 (1971). Thus in the first amended complaint plaintiffs alleged that a subheading in the article, "Ordinations called forged," was libelous; in the second amended complaint, plaintiffs allege that the four paragraphs in the article describing the ordinations are also libelous. In the original complaint, plaintiffs alleged as libelous the first sentence in the eleventh paragraph of the article, to the effect that the "State of Connecticut got a cease and desist order against them for failing to deliver merchandise"; in the second amended complaint, plaintiffs allege that the sentence directly following, stating that "[i]n a separate action, the Postal Service charged them with fraud in the bath-oil sales," is also libelous.

That the November 1, 1980 article was a single transaction or occurrence is supported by the policy behind Rule 15. The critical inquiry under Rule 15 is whether the defendant "ought to have been able to anticipate or should have expected that the character of the originally pleaded claim might be altered or that other aspects of the conduct, transaction, or occurrence set forth in the original pleading might be called into question." *See* 6 Wright & Miller, *Federal Practice and Procedure:* Civil § 1497 at 499 (1971); *Senger v. Soo Line R. Co.,* 493 F.Supp. 143, 145 (D.Minn.1980). When a suit is filed in federal court, the defendant knows that the whole transaction described in it will be fully scrutinized, by amendment if necessary. *Barthel v. Stamm,* 145 F.2d 487, 491 (5th Cir.1944), *cert. denied,* 324 U.S. 878, 65 S.Ct. 1026, 89 L.Ed. 1430 (1944); *see also Oliner v. McBride's Industries, Inc.,* 106 F.R.D. 9, 12–13 (S.D.N.Y.1985). It knows that discovery will follow, and that leave to amend will be freely granted. *Conley v. Gibson,* 355 U.S. 41, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957). Thus defendant here should have anticipated that other aspects of the November 1, 1980 article might be challenged. No additional work on its part was required to prepare a defense against the added charges, other than a stretch of memory on the part of its employees. The documents, affidavits, and other elements of the case remained the same.

▇▇ The plaintiffs' second amended complaint is directly related to its original and first amended complaints, and the additional libels alleged are contained in the article which was the subject of the original and first amended complaints. All allegations of the second amended complaint will be considered on the summary judgment motion.

## V.

Plaintiffs argue that summary judgment in libel cases is a drastic device and should not usually be granted. Indeed the Supreme Court, in a footnote in one case, had expressed doubt about the proposition, expressed by some district courts, that summary judgment as to actual malice in libel cases is the rule rather than the exception:

Considering the nuances of the issues raised here, we are constrained to express some doubt about the so-called "rule." The proof of "actual malice" calls a defendant's state of mind into question, *New York Times v. Sullivan,* 376 U.S. 254, [84 S.Ct. 710, 11 L.Ed.2d 686] ... (1964), and does not readily lend itself to summary disposition. See 10 Wright & Miller, Federal Practice and Procedure § 2730, at 590–592. Cf. *Herbert v. Lando,* 441 U.S. 153, [99 S.Ct.

1635, 60 L.Ed.2d 115] ... (1979). In the present posture of the case, however, the propriety of dealing with such complex issues by summary judgment is not before us.

*Hutchinson v. Proxmire,* 443 U.S. 111, 120 n. 9, 99 S.Ct. 2675, 2680 n. 9, 61 L.Ed.2d 411 (1979); *see also Wolston v. Reader's Digest Association,* 443 U.S. 157, 161 n. 3, 99 S.Ct. 2701, 2704 n. 3, 61 L.Ed.2d 450 (1979) (citing *Hutchinson* ). However, in a libel case in 1986, the Court appears to have reversed fields.

In *New York Times Co. v. Sullivan,* 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964), the court had held that in a libel suit brought by a public official, the First Amendment required the plaintiff to show that in publishing a defamatory statement the defendant acted with actual malice— "with knowledge that it was false or with reckless disregard of whether it was false or not," and that such actual malice must be shown with "convincing clarity." 376 U.S. at 285–86, 84 S.Ct. at 728–29. These requirements have since been extended to libel suits brought by public figures other than public officials. *See, e.g., Curtis Publishing Co. v. Butts,* 388 U.S. 130, 87 S.Ct. 1975, 18 L.Ed.2d 1094 (1967).

In *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986), the Court addressed "the question whether the clear-and-convincing-evidence requirement must be considered by a court ruling on a motion for summary judgment under Rule 56 of the Federal Rules of Civil Procedure in a case to which *New York Times* applies." *Id.* 106 S.Ct. at 2508. It held that the clear-and-convincing-evidence requirement must be considered by a court ruling on a motion for summary judgment. The Court found that "[b]y its very terms, this standard provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment: the requirement is that there be no *genuine* issue of *material* fact." *Id.* at 2510 (emphasis in original). Only facts which might affect the outcome are material:

As to materiality, the substantive law will identify which facts are material. Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted. See generally 10A C. Wright, A. Miller & M. Kane, Federal Practice and Procedure § 2725, pp. 93–95 (1983). This materiality inquiry is independent of and separate from the question of the incorporation of the evidentiary standard into the summary judgment determination. That is, while the materiality determination rests on the substantive law, it is the substantive law's identification of which facts are critical and which facts are irrelevant that governs. Any proof or evidentiary requirements imposed by the substantive law are not germane to this inquiry, since materiality is only a criterion for categorizing factual disputes in their relation to the legal elements of the claim and not a criterion for evaluating the evidentiary underpinnings of those disputes.

More important for present purposes, summary judgment will not lie if the dispute about a material fact is "genuine," that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.

*Id.* at 2510.

Where, in a public figure case, there is a factual dispute as to the existence of actual malice, the availability *vel non* of summary judgment will turn on whether or not plaintiffs can establish the presence of actual malice by clear and convincing evidence:

... [w]here the *New York Times* 'clear and convincing' evidence requirement applies, the trial judge's summary judgment inquiry as to whether a germane issue exists will be whether the evidence presented is such that a jury applying that evidentiary standard could reasonably find for either the plaintiff or the defendant. Thus, where the factual dispute concerns actual malice, clearly a material issue in a *New York Times*

case, the appropriate summary judgment question will be whether the evidence in the record could support a reasonable jury finding either that the plaintiff has shown actual malice by clear and convincing evidence or that plaintiff has not. *Id.* at p. 2514.[1]

In *Liberty Lobby,* the Court made reference to its *Hutchinson* footnote, to the effect that proof of actual malice "does not readily lend itself to summary disposition": this statement was "simply an acknowledgement of our general reluctance 'to grant special procedural protections to defendants in libel and defamation actions in addition to the constitutional protections embodied in the substantive laws.'" *Id.* at 2514 n. 7, *citing Calder v. Jones,* 465 U.S. 783, 790–91, 104 S.Ct. 1482, 1487–88, 79 L.Ed.2d 804 (1984). Thus the "convincing clarity" standard for granting or denying summary judgment in defamation actions, which has been the law in the Second Circuit, *see Herbert v. Lando,* 781 F.2d 298, 305 (2d Cir.), *cert. den.* — U.S. —, 106 S.Ct. 2916, 91 L.Ed.2d 545 (1986), *citing Yiamouyiannis v. Consumers Union,* 619 F.2d 932, 940 (2d Cir.1980), *cert. den.* 449 U.S. 839, 101 S.Ct. 117, 66 L.Ed.2d 46 (1980), has now been adopted by the Supreme Court.

My function at this summary judgment stage is not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial ... [T]here is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Anderson v. Liberty Lobby, Inc.,* 106 S.Ct. at 2511, *citing First National Bank of Arizona v. Cities Services Co,* 391 U.S. 253, 288–89, 88 S.Ct. 1575, 1592–93, 20 L.Ed.2d 569 (1968). "If the evidence is merely colorable, *Dombrowski v. Eastland,* 387 U.S. 82, 87 S.Ct. 1425, 18 L.Ed.2d 577 (1967) (per curiam), or is not significantly probative, *Cities Service,* 391 U.S. at 290, 88 S.Ct. at 1593, summary judgment may be granted." *Id.*

With these principles in mind, I address the merits of defendant's summary judgment motion.

## VI.

The threshold question is whether the various statements at issue are both false and defamatory. If they are not, they would not be actionable.

The Supreme Court recently had occasion to consider the issue of falsity in *Philadelphia Newspapers, Inc. v. Hepps,* 475 U.S. 767, 106 S.Ct. 1558, 89 L.Ed.2d 783 (1986). The Court acknowledged that "[its] opinions to date have chiefly treated the necessary showings of fault rather than of falsity." *Id.* at 1563. It noted that "a public figure plaintiff must show the falsity of the statements at issue in order to prevail on a suit for defamation," *id.,* and concluded that "the common law's rule on falsity—that the defendant must bear the burden of proving truth—must ... fall ... to a constitutional requirement that the plaintiff bear the burden of showing falsity, as well as fault, before recovering damages." *Id.* The Court recognized that under this requirement "there will be some cases in which plaintiffs cannot meet their burden despite the fact that the speech is in fact false." *Id.*

Several courts since the *Hepps* decision was rendered have considered proof of falsity as a separate element of the *prima facie* defamation case. *See, e.g., Liberty Lobby, Inc. v. Dow Jones & Co., Inc.,* 638 F.Supp. 1149, 1153 (D.D.C.1986) (plaintiff bears burden of persuasion of both falsity of statement and the actual malice with which it was made); *In re IBP Confidential Business Documents Litigation,* 797 F.2d 632, 644–48 (8th Cir.1986), *cert. den. sub. nom. Bagley v. IBP, Inc.,* — U.S. —, 107 S.Ct. 1293, 94 L.Ed.2d 150 (1987) (proof of falsity additional component borne by all first amendment defamation plaintiffs; fault and falsity two separate

1. The Second Circuit has construed *Liberty Lobby* to be a demonstration of the Supreme Court's "willingness to dispose of libel claims brought by public figure plaintiffs on summary judg-

ment." *Guccione v. Hustler Magazine, Inc.,* 800 F.2d 298, 301 n. 3 (2d Cir.1986), *cert. den.,* — U.S. —, 107 S.Ct. 1303, 94 L.Ed.2d 158 (1987).

and distinct elements); *see also Machleder v. Diaz*, 801 F.2d 46, 54 (2d Cir.1986), *cert. den.* —— U.S. ——, 107 S.Ct. 1294, 94 L.Ed.2d 150 (1987); *Davis v. Costa-Gavras*, 650 F.Supp. 153, 155 n. 2 (S.D.N.Y.1986). With respect to many of the statements in the *Times* article plaintiffs cannot meet their burden under *Hepps* of establishing falsity, and on this basis alone plaintiffs cannot recover as to these statements.

Moreover, some of the statements are simply not defamatory. For these purposes, I define defamatory as any comment that tends to injure one's reputation, as "words which tend to expose one to public hatred, shame, obloquy, contumely, odium, contempt, ridicule, aversion, ostracism, degradation or disgrace, or to induce an evil opinion of one in the minds of right-thinking persons, and to deprive one of their confidence and friendly intercourse in society." *Kimmerle v. New York Evening Journal, Inc.*, 262 N.Y. 99, 102, 186 N.E. 217 (1933) (New York law) *cited in* Sack, *Libel, Slander, and Related Problems*, Practising Law Institute (2d printing, 1980) at 45.[2]

The clearest case is with respect to plaintiffs' thirteenth claim, where plaintiffs contend that the following statement in the article is defamatory and false: "In St. Louis a decade ago, the seminarians dreamed of using profits from their musical talents to support their labors for the poor." SAC ¶ 33. Plaintiffs contend that they actually used the profits from their musical talents to support their labors for the poor, and did not merely dream of doing so. This contention, however, does not support a finding of libel. There is nothing about the statement in the article that is either false or defamatory. Nothing about this statement injures the plaintiffs' reputation. In fact, there is other language in the article which suggests that the plaintiffs were praised for their work in St. Louis slums. This statement is not actionable.

Other statements alleged to be libelous are not false, or even if false could not be considered defamatory, and hence are not actionable. The following statements fall into these categories:

*Second statement (in part):* "In a recent interview, Msgr. Andrew T. Cusack, an official with the Bridgeport Diocese, which now has jurisdiction over the mission priests, said they were 'inactive' and 'seeking reconciliation.'" SAC ¶ 11. Plaintiffs contend that that the Bridgeport Diocese does not have jurisdiction over the priests. SAC ¶ 12. There is simply nothing defamatory about these assertions, and from the evidence before me it may well be that they are not false.

*Third and Sixth statements:* "But in 1977, the State of Connecticut got a cease and desist order against them for failing to deliver merchandise." SAC ¶ 13; "In a separate action, the Postal Service charged them with fraud in the bath-oil sales." SAC ¶ 19. Plaintiffs allege that these statements, among others, arise from the failure of the article to differentiate the individual priests from Contemporary Mission as a corporation. The individual plaintiffs argue that they were not parties to the consent decree entered into by Contemporary Mission, Inc. with the Connecticut Department of Consumer Protection, nor were they subject to the actions by the IRS or the Postal Service concerning Contemporary Mission's tax exempt status. They contend that the use of the pronoun "them" in the article referring to those actions against Contemporary Mission, Inc. was both false and defamatory.

Contemporary Mission, Inc. is the corporate form utilized by the individual plaintiffs to carry on their secular business affairs. The purpose of the mail-order business was allegedly to generate revenue to finance the Mission's more spiritual pursuits. Although technically a legally separate entity, it is also undeniably true that the individual plaintiffs controlled Contemporary Mission, Inc., determined its policies and were responsible for its actions, and that Contemporary Mission acted only through them.

---

**2.** To the extent it is necessary to reach this issue, I reject plaintiffs' argument that Connecticut law should apply, and where appropriate apply New York law.

The use of "them" in the article when "Contemporary Mission, Inc." would have been more accurate was perhaps sloppy journalism and literally false. To hold a publisher liable for defamation based on such inaccuracies, however, would be elevating form over substance to an unprecedented degree. I decline to follow such a course.

■ The statement with respect to the State of Connecticut's cease and desist order, SAC ¶ 13, is inaccurate in that the actual cease and desist order required Contemporary Mission to desist from "accepting mail orders and payments for its merchandise and then failing to deliver either the ordered merchandise *or refunds within a reasonable period of time.*" (emphasis added). Plaintiffs allege that the difference between what the order actually stated and what the article claimed it stated is the difference between being labelled a sloppy businessman and a thief.[3]

■ This aspect of the article is troubling, especially because this article might well be characterized as an investigative article. As such, it would have been prepared "free from the pressures and deadlines of live news." *Gaeta v. New York News, Inc.,* 62 N.Y.2d 340, 477 N.Y.S.2d 82, 86, 465 N.E.2d 802, 806 (Ct.App.1984).[4] Nonetheless, as a practical matter the statement as published is substantially true. The cease and desist order was obtained for the failure to deliver merchan-

dise. "New York law recognizes that an alleged libel is not actionable if the published statement could have produced no worse an effect on the mind of a reader than the truth pertinent to the allegation." *Guccione v. Hustler Magazine, Inc.,* 800 F.2d 298, 302 (2d Cir.1986), *cert. den.* —— U.S. ——, 107 S.Ct. 1303, 94 L.Ed.2d 158 (1987), *citing Fleckenstein v. Friedman,* 266 N.Y. 19, 23, 193 N.E. 537 (1934). The third and sixth claims of the second amended complaint are not actionable.

■ *Seventh statement:* "As evidence of the honesty of their operation, the priests point to a Federal report saying the United States Attorney's office in Connecticut had declined, in January 1979, to prosecute charges of mail fraud against them …" SAC ¶ 21. Plaintiffs allege that the U.S. Attorney's office never considered prosecuting charges of mail fraud against them. The issue of whether the U.S. Attorney declined to prosecute does not give rise to a claim of defamation. From the evidence before me it appears that this statement is not mere speculation by the author of the article, but is supported by government documents. This statement, which constitutes plaintiffs' seventh claim, is not actionable.

■ *Eighth statement:* "Father O'Reilly later married the lead singer in the touring company and is now divorcing her." SAC ¶ 23. Plaintiffs allege that this statement

---

**3.** Defendant itself has proffered the evidence that might create a material question of fact concerning whether the publication of the statement was grossly irresponsible. Diane Henry, the author of the article, contends that she relied on a press release from the Connecticut Department of Consumer Protection that omitted the words emphasized above. But Ms. Henry was also in possession of the Department's complaint against Contemporary Mission, the cease and desist order itself, and a subsequent press release from the Connecticut Department of Consumer Protection, both of which contained the language omitted from the press release upon which she relied. Incorrectly reporting facts which are matters of public record does not, by itself, establish gross irresponsibility, *Chapadeau v. Utica Observer-Dispatch,* 38 N.Y.2d 196, 379 N.Y.S.2d 61, 341 N.E.2d 569 (Ct.App.1975); *see also Robart v. Post-Standard,* 74 A.D.2d 963, 425 N.Y.S.2d 891 (3d Dept.1980),

*aff'd,* 52 N.Y.2d 843, 437 N.Y.S.2d 71, 418 N.E.2d 664 (Ct.App.1981); *Grobe v. Three Village Herald,* 69 A.D.2d 175, 420 N.Y.S.2d 3 (2d Dept.1979), *aff'd,* 49 N.Y.2d 932, 428 N.Y.S.2d 676, 406 N.E.2d 491 (Ct.App.1980). However, relying on an inaccurate press release when in possession of an accurate one as well as the actual documents referred to in the press release, might create an issue of fact as to whether inaccurate reporting is grossly irresponsible under those circumstances.

**4.** While the lower court in *Gaeta* found that the writing of an investigative story "demanded a more rigorous standard than basic news reporting, where time pressures, in terms of newsworthiness, are critical," 95 A.D.2d 315, 466 N.Y. S.2d 321, 326 (1st Dept.1983), the Court of Appeals in reversing did not squarely address this issue.

is libelous because Father O'Reilly did not attempt to divorce his wife. SAC ¶ 24.

To find such a statement actionable would again elevate form over substance. Plaintiffs do not dispute that a divorce proceeding took place, only that O'Reilly was the initiator of that proceeding. While the language of the article may not be precise, it cannot be characterized as defamatory or false. As a statement that is substantially true, plaintiffs' eighth claim is not actionable.

*Ninth statement:* "Under normal circumstances, Father O'Reilly's marriage would mean his automatic excommunication from the church, according to experts on Canon Law. But Father O'Reilly said he had switched to the Eastern Rite of the Catholic Church, which allows married priests." SAC ¶ 25.

This statement similarly touches on plaintiff O'Reilly's divorce. Plaintiffs contend that there is no longer any such concept as "excommunication" within the Roman Catholic church, and hence "experts" on canon law would not have said what they were quoted as saying; they further argue that since Father O'Reilly transferred to the Eastern Rite prior to marrying he was not a member of the Roman Catholic church when he married, and therefore the question of "excommunication" would never have arisen. SAC ¶ 26.

■ On its face, the statement at issue is not defamatory. Nowhere in the article does it suggest that Father O'Reilly *was* excommunicated; rather, the article simply attributes to experts the opinion, which may well be erroneous, that O'Reilly *would* have been excommunicated as a Roman Catholic priest under given circumstances. Plaintiffs read into the article what is not there. Furthermore, the author of the article quoted so-called experts on Canon Law and plaintiff O'Reilly in the same paragraph on this subject. This balance negates any inference that the average reader might draw against plaintiff O'Reilly. There is no factual assertion in this statement which is false: For these reasons, plaintiffs' ninth claim is not actionable.

In finding non-actionable the statements which constitute plaintiffs' second (in part), third, sixth, seventh, eighth, ninth, and thirteenth claims, I have recognized that false statements of fact which are libelous can be actionable. Obviously, the author of an article cannot "make up facts out of whole cloth." *Rinaldi v. Holt, Rinehart & Winston, Inc.,* 42 N.Y.2d 369, 397 N.Y.S.2d 943, 952, 366 N.E.2d 1299 (Ct.App.1977), *cert. den.* 434 U.S. 969, 98 S.Ct. 514, 54 L.Ed.2d 456 (1977), *citing Spahn v. Julian Messner, Inc.,* 21 N.Y.S.2d 124, 286 N.Y.S.2d 832, 233 N.E.2d 840 (Ct.App. 1967) *app. dsmd.,* 393 U.S. 1046, 89 S.Ct. 676, 21 L.Ed.2d 600 (1969). However, "omission of relatively minor details in an otherwise basically accurate account is not actionable. This is largely a matter of editorial judgment in which the courts, and juries, have no proper function." *Rinaldi,* 397 N.Y. S.2d at 952, 366 N.E.2d 1299 *citing James v. Gannett Co.,* 40 N.Y.2d 415, 386 N.Y. S.2d 871, 877, 353 N.E.2d 834, 840 (Ct.App. 1976). With respect to the statements discussed above, plaintiffs have not demonstrated that the defendant's actions went further than simply making imprecise or inarticulate statements. "Where, as here, 'the truth is so near to the facts as published that fine and shaded distinctions must be drawn and words pressed out of their ordinary usage to sustain a charge of libel, no legal harm has been done.'" *Guccione v. Hustler Magazine, Inc.,* 800 F.2d 298, 303 (2d Cir.1986), *cert. den.* — U.S. —, 107 S.Ct. 1303, 94 L.Ed.2d 158 (1987), *citing Cafferty v. Southern Tier Publishing Co.,* 226 N.Y. 87, 93, 123 N.E. 76 (1919).

The Supreme Court in *Hepps* noted that its decision added "only marginally to the burdens that the plaintiff must already bear as a result of [its] earlier decisions in the law of defamation. The plaintiff must show fault." 106 S.Ct. at 1565. It also acknowledged that the inquiries into whether statements are false and whether the publisher of those statements adequately investigated the truth of the published statements or was at fault for failing to do so are overlapping: "As a practical matter, then, evidence offered by plaintiffs on the publisher's fault in adequately investigating the truth of the published state-

ments will generally encompass evidence of the falsity of the matters asserted." *Id.*

With that guideline in mind, I turn now to the question of defendant's fault.

## VII.

■■■ The threshold issue as to defendant's fault is the determination of the plaintiffs' status as public or private figures. This determination must be made initially in order to ascertain the standard of fault plaintiffs must establish in order to succeed on their claims. If plaintiffs are public figures, then they cannot prevail in this action absent clear and convincing proof of actual malice by the defendant. If, however, plaintiffs are private figures, then the subject matter of the allegedly defamatory statements must be considered, and determination made as to whether the subject matter is of public or private concern.

As has already been noted, the Supreme Court in *New York Times Co. v. Sullivan*, 376 U.S. 254, 279–80, 84 S.Ct. 710, 725–26, 11 L.Ed.2d 686 (1964), placed a significant constitutional limitation on the ability of a public official to recover in an action for libel, holding that he cannot be awarded damages for a defamatory falsehood concerning his official conduct unless he proves that the statement was published with "actual malice." The Supreme Court extended the rule of *New York Times Co.* to "public figures", at least in matters of public interest, in *Curtis Publishing Co. v. Butts*, 388 U.S. 130, 162, 87 S.Ct. 1975, 1995, 18 L.Ed.2d 1094 (1967). In *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 94 S.Ct. 2997, 41 L.Ed.2d 789 (1974), the Court defined two classes of public figures, general and limited: "In some instances an individual may achieve such pervasive fame or notoriety that he becomes a public figure for all purposes and in all contexts." *Id.* at 351, 94 S.Ct. at 3012. This is the *general* public figure. The other category is the *limited* public figure. The Court explained that "[m]ore commonly, an individual voluntarily injects himself or is drawn into a particular public controversy and thereby becomes a public figure for a limited range of issues." *Id.*

In *Gertz*, the Court considered the case of a private individual who brought a libel action, and the standards which states could use in determining whether to permit the imposition of liability for making defamatory statements about such private individuals. It held that "so long as they do not impose liability without fault, the states may define for themselves the appropriate standard of liability for a publisher or broadcaster of defamatory falsehood injurious to a private individual." *Id.* at 347, 94 S.Ct. at 3010.

The New York Court of Appeals responded to the Supreme Court's invitation to define the standard of liability in *Chapadeau v. Utica Observer Dispatch*, 38 N.Y.2d 196, 379 N.Y.S.2d 61, 341 N.E.2d 569 (1975):

... [W]ithin the limits imposed by the Supreme Court where the content of the article is arguably within the sphere of legitimate public concern, which is reasonably related to matters warranting public exposition, the party defamed may recover; however, to warrant such recovery he must establish, by a preponderance of the evidence, that the publisher acted in a grossly irresponsible manner without due consideration for the standards of information gathering and dissemination ordinarily followed by responsible parties.

*Id.* at 64, 341 N.E.2d 569.

■■■ Thus if a plaintiff is a private individual and the subject matter is of public concern, then the plaintiff, to prevail under New York law, must demonstrate by a preponderance of the evidence that defendant in its preparation of the libelous statement complained of "acted in a grossly irresponsible manner without due consideration for the standards of information gathering and dissemination ordinarily followed by responsible parties." *Chapadeau v. Utica Observer-Dispatch*, 38 N.Y.2d 196, 379 N.Y.S.2d 61, 64, 341 N.E.2d 569, 572 (1975).

In *Gertz*, the Supreme Court rejected the argument that the plaintiff there, a reputable lawyer, was a public figure, holding that "in looking to the nature and extent of

an individual's participation in the particular controversy giving rise to the defamation," it was plain that Gertz was not a public figure. *Id.* 418 U.S. at 352, 94 S.Ct. at 3013. This was so because he did not "thrust himself into the vortex of [a] public issue, nor did he engage the public's attention in an attempt to influence its outcome." *Id.*

The Second Circuit has had occasion to consider the public figure doctrine in detail, and has succinctly summarized the relevant cases since *Gertz*:

> Emphasizing that the *New York Times* standard does not hinge on whether the statement concerns a matter of public interest, the Supreme Court held that a *cause celebre* divorce in Florida involving a prominent and wealthy couple was not a 'public controversy.' *Time, Inc. v. Firestone*, 424 U.S. 448, 454, 96 S.Ct. 958, 965, 47 L.Ed.2d 154 (1975). Moreover, the fact that Mrs. Firestone sought to obtain marital redress through a court proceeding is not the kind of voluntary act or assumption of prominence in the resolution of public questions as to render her a 'public figure.' *Id.* at 454–55, 96 S.Ct. at 965–66. Four years later, the Court ruled that a person was not a public figure merely because he refused to appear before a grand jury, fully realizing that his refusal might attract publicity, because he was believed to have information of interest to the government relating to Soviet espionage. *Wolston v. Reader's Digest Assn., Inc.*, 443 U.S. 157, 99 S.Ct. 2701, 61 L.Ed.2d 450 (1979). Rather than thrusting himself to the forefront of the public controversy surrounding the extent of Soviet espionage in the United States, the petitioner in *Wolston* was dragged unwillingly into the controversy. *Id.* at 166. Again, becoming the recipient of Senator Proxmire's Golden Fleece Award as a result of the receipt of federal funds for research projects did not make plaintiff a limited public figure. *Hutchinson v. Proxmire*, 443 U.S. 111, 99 S.Ct. 2675, 61 L.Ed.2d 411 (1979). Although, like the petitioner in *Gertz*, Hutchinson was a writer for professional journals, he did not thrust himself or his views into the public eye to influence others, nor did he invite public attention or have regular and continuing access to the media. *Id.* at 135–36, 99 S.Ct. at 2688–89.
>
> *Lerman v. Flynt Distributing Co., Inc.*, 745 F.2d 123, 136 (2d Cir.1984), *cert. den.* 471 U.S. 1054, 105 S.Ct. 2114, 85 L.Ed.2d 479 (1985). In *Lerman*, the Second Circuit found that the question in each of these Supreme Court cases was "what is 'the nature and extent of an individual's participation in the particular controversy giving rise to the defamation.' " *Id. citing Gertz*, 418 U.S. at 352, 94 S.Ct. at 3013; *Wolston*, 443 U.S. at 167, 99 S.Ct. at 2707.

The Second Circuit in *Lerman* then set forth the requisites for a finding that a libel plaintiff is a "limited purpose public figure":

> A defendant must show the plaintiff has: (1) successfully invited public attention to his views in an effort to influence others prior to the incident that is the subject of litigation; (2) voluntarily injected himself into a public controversy related to the subject of the litigation; (3) assumed a position of prominence in the public controversy; and (4) maintained regular and continuing access to the media.

*Lerman*, 745 F.2d at 137.

The question of whether the plaintiffs in this action are public figures, limited or otherwise, is one of law to be decided by the court. *Rosenblatt v. Baer*, 383 U.S. 75, 88 n. 15, 86 S.Ct. 669, 677 n. 15, 15 L.Ed.2d 597 (1966); *Dameron v. Washington Magazine, Inc.*, 779 F.2d 736, 740 (D.C. Cir.1985), *cert. den.* —— U.S. ——, 106 S.Ct. 2247, 90 L.Ed.2d 693 (1986). If found to be public figures, plaintiffs cannot recover unless there is "clear and convincing proof" that the article was published "with knowledge of its falsity or with reckless disregard for the truth." *Gertz*, 418 U.S. at 342, 94 S.Ct. at 3008.

## VIII.

Plaintiffs cannot be characterized as general purpose public figures. They have simply not achieved the "pervasive

fame or notoriety" that would warrant that status. The relevant inquiry is whether plaintiffs are limited purpose public figures. In determining whether a plaintiff is a limited purpose public figure under *Gertz* and its progeny, an analysis of the nature of the controversy and the plaintiff's role in that controversy is required.

In this case, two distinct controversies are involved. The first is the "religious controversy" concerning plaintiffs' ordination and their status as priests. Included in this category must be plaintiffs' artistic endeavors, which went hand-in-hand with their religious mission. The second controversy concerns the actions taken by various governmental agencies against the Contemporary Mission mail order business. Any analysis of the particular facts of this case also requires consideration of another issue: whether if the plaintiffs were limited purpose public figures a decade ago they should continue to be characterized as limited purpose public figures in this lawsuit.

## A. *The Religious Controversy: Plaintiffs As Public Figures*

The religious controversy surrounding plaintiffs' ordination in and of itself generated widespread press coverage and attracted public attention for several years. It apparently remains a current controversy, never definitively having been resolved.

The existence of the continuing religious controversy, even within the context of plaintiffs' erstwhile musical activities, does not without more establish that plaintiffs are (or were) public figures. The Supreme Court has repeatedly looked for some further voluntary conduct by a plaintiff to render him a public figure for constitutional purposes. I must determine whether plaintiffs voluntarily " 'thrust themselves to the forefront of ... [the] public controvers[y] in order to influence the resolution of the issues involved.' " *Velle Transcendental Research Assn v. Sanders,* 518 F.Supp. 512, 517 (C.D.Calif.1981) *citing Gertz,* 418 U.S. at 345, 94 S.Ct. at 3009. I must also consider whether plaintiffs "successfully invited public attention to [their] views in an effort to influence others",

whether they "assumed a position of prominence" in the controversy, and whether they maintained regular access to the media. *Lerman,* 745 F.2d at 1337. For the reasons which follow, I find that they did.

In *Gertz,* the Court held that an attorney was not a public figure even though he voluntarily associated himself with a case that was certain to receive a great deal of media exposure. 418 U.S. at 352, 94 S.Ct. at 3013. The Supreme Court held in *Wolston,* 443 U.S. at 166, 99 S.Ct. at 2707, that Ilya Wolston did not thrust himself voluntarily into the investigation of Soviet espionage in the United States. The "mere fact that [Wolston] voluntarily chose not to appear before [a] grand jury, knowing that his action might be attended by publicity, [was] not decisive on the question of public figure status." *Id.* at 167, 99 S.Ct. at 2707. In this case, however, the plaintiffs' self-promotion was the antithesis of the comportment of Gertz and Wolston.

█ The musical careers of the members of Contemporary Mission in and of itself focused public attention on them and the religious controversy surrounding them. Moreover, Contemporary Mission and some, if not all, of its members were directly implicated in the controversy surrounding the ordination of some of its members. At least some of the plaintiffs actively participated in that controversy, issuing press releases and conducting interviews designed to advance their positions with respect to the controversy. Thus their participation in the controversy was not passive. They played prominent roles.

The individual plaintiffs, through active public relations activities and otherwise, gained "access to the channels of effective communication and hence ... a ... realistic opportunity to counteract false statements." *Gertz,* 418 U.S. at 344, 94 S.Ct. at 3009. The nature of plaintiffs' apostolic mission necessitated communication with the general public. During and after the time the Mission Singers were formed, some or all of the plaintiffs granted interviews, issued press releases, made nationwide and local television appearances, participated in radio programs, gave live musi-

cal performances, sold records, and wrote books. These activities evidence that, in the late 1960's and early 1970's, plaintiffs had access to the media and were very much in the public eye. These plaintiffs were not "dragged unwillingly" into the controversy. *Cf. Wolston*, 443 U.S. at 166, 99 S.Ct. at 2707. Their activities within the Catholic Church, especially as they related to the publicity concerning the ordination of some of them, constituted aggressive efforts on their part to publicize themselves and their positions.

Taking all of these facts together, plaintiffs must be considered at least limited purpose public figures for the period of time when their artistic careers, combined with the religious controversy regarding ordination, was at its peak. Plaintiffs recognized this status themselves when they wrote to Cardinal Carberry in 1971 to thank him for making them "celebrities, almost household words." [5]

### B. *The Lapse of Time Issue*

Plaintiffs argue that even if they were public figures with respect to the 1971 ordinations, they can no longer be considered public figures for the purposes of this action. While plaintiffs concede that defendant's Publicity Appendix includes almost 200 articles which were written about them prior to 1974, they assert that since that time there has been a paucity of publicity, and plaintiffs have returned to private life. The activities of some of the plaintiffs as members of The Mission Singers took place prior to 1974, and there have been no national television appearances or concerts

since that time, nor have any record albums been produced by The Mission Singers in the past 13 years.

The Supreme Court has explicitly left unanswered the question of "whether or when an individual who was once a public figure may lose that status by the passage of time." *Wolston*, 443 U.S. 157, 166 n. 7, 99 S.Ct. 2701, 2706 n. 7, 61 L.Ed.2d 450 (1979).[6]

The Second Circuit, in an opinion which antedated by many years the constitutional developments stemming from *Sullivan* and *Gertz*, dealt with the question of persistency of public concern in a matter. It found that the passage of time did not alter the standard of liability, and affirmed a judgment for a magazine that had updated a 27–year old story about a child prodigy despite the fact that he had become a recluse. *Sidis v. F–R Publishing Corp.*, 113 F.2d 806 (2d Cir.1940), *cert. denied*, 311 U.S. 711, 61 S.Ct. 393, 85 L.Ed. 462 (1940). The court reasoned that the prodigy's "subsequent history, containing as it did the answer to the question of whether or not he had fulfilled his early promise, was still a matter of public concern." *Id.* at 809.

While the Second Circuit has not squarely addressed the issue of endurance of public figure status, it seems to have assumed *sub silentio* that the public figure status is, or may be, retained over the passage of time. In *Meeropol v. Nizer*, 560 F.2d 1061, 1066 (1977), *cert. denied*, 434 U.S. 1013, 98 S.Ct. 727, 54 L.Ed.2d 756 (1978), the children of Julius and Ethel Rosenberg, having spent most of their early years in the lime-

---

**5.** In a similar case, a California district court, after considering various newspaper articles publicizing a religious group's way of life, held that a public controversy existed over the nature and legitimacy of the small religious group involved and also found the plaintiffs to be public figures. *See Velle Transcendental Research Ass'n v. Sanders*, 518 F.Supp. 512 (C.D.Calif. 1981). In *Velle*, as in this case, plaintiffs were members of a non-profit religious organization whose practices were contested and whose conduct led to government action against the group.

**6.** The lower courts in *Wolston* had held that plaintiff was a public figure and had rejected his argument that the passage of time had diminished his status to a private figure for first amend-

ment purposes. He subsequently abandoned this argument before the Supreme Court and thus the Court's majority opinion did not address the issue. However, it should be noted that Justice Blackmun's concurrence, joined by Justice Marshall, explored this issue in detail, and concluded that "the lapse of 16 years between petitioner's participation in the espionage controversy and respondents' defamatory reference to it was sufficient to erase whatever public-figure attributes petitioner once may have possessed." *Wolston*, 443 U.S. at 171, 99 S.Ct. at 2709. *See Brewer v. Memphis Publishing Co.*, 626 F.2d 1238, 1256 (5th Cir.1980) (discussing *Wolston* concurrence).

light (through no efforts or activities of their own), were found to be public figures for purposes of subsequent commentary on the Rosenberg trials in a book published 20 years after the execution of their parents.

Other courts have addressed this issue more recently and more explicitly.

In *Street v. National Broadcasting Company*, 645 F.2d 1227 (6th Cir.), *cert. granted* 454 U.S. 815, 102 S.Ct. 91, 70 L.Ed.2d 83 *cert. dismissed*, 454 U.S. 1095, 102 S.Ct. 667, 70 L.Ed.2d 636 (1981), the Sixth Circuit rejected plaintiff's argument that even if she was a public figure at the time of the well-publicized Scottsboro trial in the 1930's, she lost her public figure status over the intervening forty years. *Id.* at 1235. The court emphasized that "[t]here is no reason for the debate to be any less vigorous when events that are the subject of current discussion occurred several years earlier. The mere passage of time does not automatically diminish the significance of events or the public's need for information." *Id.* at 1236.

In *Brewer v. Memphis Publishing Co.*, 626 F.2d 1238, 1256–57 (5th Cir.1980), *cert. den.* 452 U.S. 962, 101 S.Ct. 3112, 69 L.Ed.2d 973 (1981), plaintiff was an entertainer who had retired for eight years while she became a companion of another entertainer, Elvis Presley. Plaintiff "had gained media exposure and fame through her career and her romantic relationship with Presley, an extremely well-known entertainer, and [her] name continued to appear in stories about Presley after her retirement ..." She "was required to prove malice in [a] suit based on an article that dealt primarily with that romantic relationship and incidentally with her marital status." 626 F.2d at 1257.

The Mississippi Supreme Court in *Newson v. Henry*, 10 Med.L.Rptr. 1421 (1984), ruled that a libel plaintiff who was clearly a public figure when he ran unsuccessfully for deputy sheriff in 1967 and who subsequently retired from public life nevertheless remained a public figure for purposes of commentary in 1980 upon that 1967 campaign.

In *Holt v. Cox Enterprises*, 10 Med.L. Rptr. 1695 (N.D.Ga.1984), the plaintiff, a star Alabama football player who had been involved in a highly publicized incident during a 1961 football game that precipitated a public controversy about college football, was held to be a public figure in his libel action against a newspaper which had published articles in 1979 recounting the 1961 incident.

All of these cases stand for the proposition that "[o]nce a person becomes a public figure, he or she remains a public figure with respect to the event or events that made him or her a public figure in the first place." *Newson*, 10 Med.L.Rptr. at 1424–25. That proposition is applicable in this case. Thus, because the plaintiffs were public figures with respect to their religious controversy in the early 1970's, they remain public figures with respect to later commentary upon or treatment of that controversy. The November 1, 1980 article addressed the religious controversy, with respect to which plaintiffs were public figures in the late 1960's and early 1970's. For purposes of the allegedly defamatory statements pertaining to that controversy, plaintiffs remain public figures.

C. *Plaintiffs' Status in the Business Controversy*

The remaining issue with respect to plaintiffs' status is whether they are also public figures for purposes of the business controversy. This issue has been mooted to the extent that I have already found that the three statements pertaining exclusively to the business controversy (statements 3, 6 and 7, *supra*, p. 254) are either not defamatory or not false as a matter of law, and therefore not actionable (see pp. 259–61, *supra*). However, there are two other statements, claims 10 and 11, which I have characterized as hybrid statements pertaining to both the religious and the business controversy. Thus it is necessary to consider the issue of plaintiffs' status in the business controversy. To consider plaintiffs' status in this context raises the question as to whether plaintiffs can be characterized as public figures for some purposes

and private figures for others. This novel question arises to the extent that I construe the *Times* article to address two separate and distinct controversies.

Plaintiffs contend that with regard to the controversy concerning Contemporary Mission's mail-order business they have conducted themselves much differently; they have issued no press releases and have not sought to publicize their position through the media. Although their business has sent out over 12 million mailings since 1976, they argue that none of those mailings was related to the current controversy except as one of its causes. They submit that a person does not become a public figure merely because he is a criminal defendant, *Wolston,* 443 U.S. 157, 99 S.Ct. 2701, 61 L.Ed.2d 450 (1979) or because he is involved in litigation, *Firestone,* 424 U.S. 448, 96 S.Ct. 958, 47 L.Ed.2d 154 (1976), and that this rule should not have a different application when the litigant happens to be in the mail-order business.

At least one recent case from this district addresses the issue. In *Adler v. Conde Nast Publications, Inc.,* 643 F.Supp. 1558 (S.D.N.Y.1986), Renata Adler, a well-known writer and critic, brought a libel suit, contending that an article about her departure from an editorial position with a magazine defamed her by falsely asserting that she was fired for incompetence and dishonesty. In finding no malice as a matter of law on the part of one of the defendants, the court ruled that Adler's general fame rendered her a public figure "with regard to her activities relating to literature, journalism and criticism," *id.* at 1565, and that she could not now claim, "with regard to an article concerning her activity as a writer/editor published in a magazine directed principally to persons interested in literary matters, that she is not a public figure." *Id.*

It is true that Contemporary Mission and its members did not seek the attention of the IRS, the Postal Service or the Connecticut Department of Consumer Protection. They did not thrust themselves voluntarily into the investigations of their activities and, in marked contrast to their actions in the religious controversy, they have not utilized the media to further their points of view or to attempt to sway public opinion.

However, plaintiffs have conducted their business activities as members of a religious community, with respect to which the religious controversy subsists. The lead paragraph of the article, which constitutes plaintiffs' tenth claim, suggests the intertwined nature of the plaintiffs' various activities: "Five Roman Catholic priests, whose religious status is being challenged by officials of their own church, as well as by three Federal agencies, say they have been misunderstood and harassed because they are unconventional clerics." This statement explicitly addresses plaintiffs' status as religious, and it is clear that the focus of the article is on the plaintiffs as priests. It is highly unlikely such an article would have been written and given such prominent coverage were the plaintiffs simply Connecticut businessmen; the thrust of the story was that a group of priests, with a somewhat unusual history, had encountered challenges by the government. The overlapping of the two controversies is epitomized by the fact that plaintiffs' mail-order business which has been challenged by the government was created to generate revenue to finance the plaintiffs' religious pursuits.

▪ Plaintiffs were and continue to be public figures with respect to the religious controversy. The fact that they avowedly carried on their business activities in furtherance of their religious commitments constituted them public figures with respect to those activities as well.

Thus, in order to prevail as to the allegedly defamatory statements pertaining to either controversy, plaintiffs must prove actual malice on the part of defendant.

## IX.

**A. *Standard of Malice in Public Figure Libel Cases***

As limited public figure plaintiffs with respect to all of their activities, Contemporary Mission and its members must establish actual malice in order to recover actual

damages in a defamation suit. "In general terms, a defendant can be said to have acted with actual malice, in the constitutional sense, when: (1) a statement is made with actual knowledge of its falsity, *New York Times Co. v. Sullivan,* 376 U.S. at 279–80, 84 S.Ct. at 275–76, or (2) there is a high degree of awareness of the statement's probable falsity, *Garrison v. Louisiana,* 379 U.S. 64, 74, 85 S.Ct. 209, 215, 13 L.Ed.2d 125 (1964); or (3) a statement is made with reckless disregard of its truth or falsity, *New York Times Co. v. Sullivan,* 376 U.S. at 279–80, 84 S.Ct. at 275–76. In addition, actual malice must be shown by 'clear and convincing' evidence." *Fitzgerald v. Penthouse International, Ltd.,* 525 F.Supp. 585, 597 (D.Md.1981), *aff'd in part and rev'd in part,* 691 F.2d 666 (4th Cir. 1982), *cert. den.* 460 U.S. 1024, 103 S.Ct. 1277, 75 L.Ed.2d 457 (1983), *citing Gertz v. Robert Welch, Inc.,* 418 U.S. 323, 342, 94 S.Ct. 2997, 3008, 41 L.Ed.2d 789 (1974); *New York Times Co. v. Sullivan,* 376 U.S. 254, 285–86, 84 S.Ct. 710, 728–29, 11 L.Ed.2d 286 (1964).

■ Malice, as the Supreme Court enunciated in *New York Times,* does *not* mean hatred or ill will. *Garrison v. Louisiana,* 379 U.S. 64, 78–79, 85 S.Ct. 209, 217–18, 13 L.Ed.2d 125 (1964). Instead, plaintiffs must show that the *Times* either deliberately falsified its statements concerning the controversies or published them "recklessly" despite its awareness of their probable falsity. *St. Amant v. Thompson,* 390 U.S. 727, 730, 88 S.Ct. 1323, 1325, 20 L.Ed.2d 262 (1968). According to the Supreme Court in *St. Amant,* "[t]here must be sufficient evidence to permit the conclusion that the defendant in fact entertained serious doubts as to the truth of [its] publication. Publishing with such doubts shows reckless disregard for truth or falsity and demonstrates actual malice." *Id.* at 731, 88 S.Ct. at 1325. The Second Circuit has observed:

> [A] finding of actual malice cannot be predicated merely on a charge that a reasonable publisher would have further investigated before publishing … Rather, a public figure defamation plaintiff must show either that the publisher actu-

ally entertained serious doubts about the veracity of the publication, or that there are '*obvious* reasons to doubt the veracity of the informant or the accuracy of his reports.'

*Herbert v. Lando,* 781 F.2d 298, 308 (2d Cir.1986), *cert. den.,* — U.S. —, 106 S.Ct. 2916, 91 L.Ed.2d 545 (1986) *citing St. Amant,* 390 U.S. at 731, 88 S.Ct. at 1325.

Guided by this definition of actual malice, as well as by the Supreme Court's ruling in *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986) that the clear-and-convincing-evidence requirement must be considered by a court ruling on a motion for summary judgment in a libel case, I turn to the issue of actual malice.

### B. *Requests for Further Discovery on the Malice Issue*

I first address plaintiffs' threshold argument that the evidence on the issue of actual malice has not been fully marshalled and that further discovery is needed, and specifically plaintiffs' remaining requests for further discovery pursuant to F.R. Civ.P. 56(f).

Plaintiffs have contended that *Times* reporter Diane Henry's state of mind is at issue in deciding whether the defendant acted with actual malice. They also urge that they be allowed to depose Henry's husband, Nicholas Horrock, who was at the time of the article the deputy metropolitan editor at the *Times.* Plaintiffs observe that Horrock was an investigative reporter at the *Times* prior to his editorial position. Accordingly, plaintiffs argue that it should be "self-evident" that further discovery is required with respect to the state of mind of Henry and Horrock.

Plaintiffs seek additional discovery under Fed.R.Civ.P. 56(f), which provides:

> Should it appear from the affidavits of a party opposing the motion that he cannot for reasons stated present by affidavit *facts essential to justify his opposition,* the court may refuse the application for judgment or may order a continuance to permit affidavits to be obtained or depo-

sitions to be taken or discovery to be had or may make such other order as is just. (*emphasis added*).

The Second Circuit has enunciated the standard to be used in Rule 56(f) motions in *Quinn v. Syracuse Model Neighborhood Corp.*, 613 F.2d 438 (2d Cir.1980): "At least when the party opposing the motion has not been dilatory in seeking discovery, summary judgment should not be granted when he is denied *reasonable access to potentially favorable information*." *Id.* at 445 (*emphasis added*).

▮ Plaintiffs under Rule 56(f) must therefore establish 1) that they have been denied reasonable access to the material requested; and 2) that the material requested constitutes potentially favorable information. In addition, plaintiffs must identify specific issues of material fact which are likely to be disclosed if they are granted a reasonable opportunity to pursue the additional discovery they seek. *See Federal Republic of Germany v. Elicofon*, 536 F.Supp. 813 (E.D.N.Y.1978), *aff'd sub nom., Kunstsammlungen Zu Weimar v. Elicofon*, 678 F.2d 1150 (2d Cir.1982).

In an earlier case involving the corporate plaintiff, *Contemporary Mission, Inc. v. U.S. Postal Service*, 648 F.2d 97, 107 (2d Cir.1981), plaintiff was denied additional discovery under Rule 56(f) because it failed to justify its allegations: "[a] 'bare assertion' that the evidence supporting a plaintiff's allegation is in the hands of the defendant is insufficient to justify a denial of a motion for summary judgment under Rule 56(f)." Rule 56(f) is not a license for a fishing expedition. *Quinn* teaches that the plaintiffs would need to demonstrate that the material they expect to develop by further discovery is probably available, and is potentially favorable to them. Plaintiffs have not met their burden of showing how the deposition of Horrock would produce material evidence which would be potentially favorable to them.

▮ Defendant has already answered interrogatories identifying everyone at the *Times* who worked on the allegedly libelous article. Mr. Horrock was not one of those persons. Ms. Henry has already

been extensively deposed on the subject. Plaintiffs assert that a deposition of her husband, Nicholas Horrock, would produce more evidence of actual malice. They allege that he was the "editorial boss" of Diane Henry as well as her husband, and must have had input with respect to the article in question.

It is, of course, possible that Ms. Henry discussed her research and the formulation of the article with Mr. Horrock in his capacity as her husband, but the record indicates that he had nothing to do with the editing of the article.

None of the other bases upon which plaintiffs seek further discovery has merit. I deny plaintiffs' motion for further discovery.

### C. *Insufficient Evidence to Support Finding of Malice*

Plaintiffs allege that Diane Henry's malice permeates the article of November 1, 1980. Plaintiffs set forth several instances of conduct which, they claim, constitute actual malice. However, they confuse constitutional "actual malice" with common law malice or ill-will.

In arguing that Ms. Henry "blackened" and "wrecked" their reputation, that she was "obsessed" with the article, and that she "did her dirty work well", plaintiffs fail to demonstrate any *reckless disregard* of the truth. In short, their allegations fail to satisfy the standards for actual malice set forth by the Supreme Court.

The Second Circuit has noted, in addressing a claim of slander of title, that a "plaintiff does not become entitled to a jury trial simply by asserting a cause of action in which the defendant's state of mind is a material element. Some facts must be asserted to support the claim that the state of mind existed." *Markowitz v. Republic National Bank of New York*, 651 F.2d 825, 828 (2d Cir.1981). Plaintiffs here have failed to set forth specific facts indicating constitutional actual malice on the part of the defendant.

Plaintiffs claim, as to the religious controversy, that Ms. Henry authored a series

of defamatory statements which struck at the heart of the individual plaintiffs' profession. Specifically, 1) they assert that she ignored plaintiffs' warnings that any accusation that documents were forged for plaintiffs' ordination would be untrue and defamatory; 2) they conclude that Ms. Henry's failure to ascertain the accuracy of the charges after being explicitly warned evidences actual malice; and 3) they argue that three of Henry's sources now say that they did not give her the information she claims she received, and that this constitutes further evidence of actual malice.

■ Publication in the face of a denial by plaintiffs of a statement's truth does not demonstrate actual malice. "[S]uch denials are so commonplace in the world of polemical charge and countercharge that, in themselves, they hardly alert the conscientious reporter to the likelihood of error." *Edwards v. National Audubon Society, Inc.*, 556 F.2d 113, 121 (2d Cir.1977), *cert. denied*, 434 U.S. 1002, 98 S.Ct. 647, 54 L.Ed.2d 498 (1977).

The article may not epitomize investigative journalism at its best. It is subject to the criticism that it is sloppily written in places, that it does not follow up certain points, and that it is sometimes quite vague. However, "[l]iteral accuracy is not a prerequisite: if we are to enjoy the blessings of a robust and unintimidated press, we must provide immunity from defamation suits where the journalist believes, reasonably and in good faith, that his report accurately conveys the charges made." *Id.* at 120 *citing Time, Inc. v. Pape*, 401 U.S. 279, 91 S.Ct. 633, 28 L.Ed.2d 45 (1971).

■ Despite the article's deficiencies, its author made an attempt to report plaintiffs' side of the story. The article stated, for example, that the priests were ordained; that they disclaimed knowledge of any forged documents in connection with their ordination, and that they performed and intended to perform many altruistic acts. *Compare Cianci v. New Times Pub. Co.*, 639 F.2d 54 (2d Cir.1980) (case on which plaintiffs rely where *New Times* made no mention of plaintiff's claim of innocence in an article discussing charges of rape against him).

Defendant has submitted as exhibits the reporter's interview notes, and a number of published newspaper articles dealing with the religious controversy in which plaintiffs were involved. While plaintiffs dispute the accuracy of some of those articles, they have not offered a scintilla of evidence to satisfy their burden of proving that the Times *knew* that the statements it published were false because the sources upon which they were based were false. True it is that a publisher "who in fact espouses or concurs in the charges made by others, or who deliberately distorts these statements to launch a personal attack of his own on a public figure, cannot rely on a privilege of neutral reportage." *Edwards*, 556 F.2d at 120. The article certainly reflects no sympathy for the posture or plight of plaintiffs; it is probable that the *Times* saw newsworthiness in the fact that members of a Catholic religious order were beleaguered. However, nothing before me suggests that the author of the article in question, or anyone at the *Times*, deliberately distorted any statements, or recklessly disregarded their truth or falsity. Plaintiffs have simply not shown that the *Times* "entertained serious doubts about the veracity of the publication," or that there were signs which should have tipped the *Times* off to any blatant inaccuracies in the article.

### D. *The Article's Cumulative Effect*

One further point merits discussion. In *Herbert v. Lando*, 781 F.2d 298, 307 (2d Cir.1986), *cert. den.*, — U.S. —, 106 S.Ct. 2916, 91 L.Ed.2d 545 (1986), a recent Second Circuit libel decision, plaintiff appealed the district court's refusal to consider the "overall impact" of the television broadcast and magazine article that had given rise to the lawsuit. The district court had ruled that a defamation plaintiff was obliged to specify those statements which he claimed were made with actual malice. Plaintiff claimed that the publications in overall impact were defamatory and demonstrated actual malice, and that the district court should have considered

the defamatory nature of the publications as a whole. The Second Circuit disagreed, holding that the "overall impact" of the broadcast and article could not itself constitute a cause of action.

While plaintiffs in the instant case do not explicitly plead a separate cause of action predicated on the overall impact of the article, such a theory pervades their arguments. On the basis of *Lando,* I reject this argument as well. While it is true that "offending statements can only be viewed in the context of the writing as a whole, and not as disembodied words, phrases or sentences," *Gaeta v. New York News Inc.,* 62 N.Y.2d 340, 477 N.Y.S.2d 82, 85, 465 N.E.2d 802, 805 (Ct.App.1984), in this case "the defamatory implications of the specific statements and the overall impact of the publications are [virtually] identical." *Lando,* 781 F.2d at 308. Moreover, an evaluation of the article as a whole reveals that plaintiffs' position with respect to the various controversies is sufficiently represented. In fact, the article includes at least 11 different statements which directly quote the plaintiffs themselves, or attribute positions to the plaintiffs, including the article's lead.

Thus, to the extent plaintiffs argue that the cumulative effect or overall impact of the article is defamatory, I disagree. While it is true that the courts " 'will not strain' to interpret [allegedly defamatory works] 'in their mildest and most inoffensive sense to hold them nonlibelous' " (*November v. Time Inc.,* 13 N.Y.2d 175, 244 N.Y.S.2d 309, 311, 194 N.E.2d 126, 128, *quoting Mencher v. Chesley,* 297 N.Y. 94, 99, 75 N.E.2d 257), it is also true courts will not strain to find a defamatory interpretation where none exists (*see Tracy v. Newsday, Inc.,* 5 N.Y.2d 134, 182 N.Y.S.2d 1, 155 N.E.2d 853)." *Cohn v. National Broadcasting Co., Inc.,* 50 N.Y.2d 885, 430 N.Y. S.2d 265, 265, 408 N.E.2d 672 (Ct.App. 1980), *cert. den.* 449 U.S. 1022, 101 S.Ct. 590, 66 L.Ed.2d 484 (1980).

Because plaintiffs have not established actual malice in the constitutional sense, I grant defendant's motion for summary judgment concerning the statements alleged to be defamatory in plaintiffs' Second Amended Complaint.[7]

### X.

In summary, in this Memorandum Order I have made the following determinations:

1. Defendant's motion to dismiss the 10 new claims in the second amended complaint on statute of limitations grounds is denied.

2. I grant summary judgment to defendant with respect to plaintiffs' second (in part), third, sixth, seventh, eighth, ninth, and thirteenth claims because they are either not defamatory or not false or both.

3. Plaintiffs' request for further discovery pursuant to F.R.Civ.P. 56(f) is denied.

4. Summary judgment is granted as to all of plaintiffs' claims and the complaint is dismissed because plaintiffs have provided insufficient evidence to support a finding of actual malice.

SO ORDERED.

---

7. This grant of summary judgment on the basis of failure to establish actual malice applies with respect to all statements in the article, including those which I have found to be not false or not defamatory.